C. Interrogation During the Second Cigarette Break on October 15
During the second cigarette break,[7] the detectives talked with defendant about having *1073 lunch, after which all three engaged in casual conversation about the transit police, defendant's health problems, fishing, and smoking and drinking. Defendant then talked quite a bit about his various relatives, then asked, "So I am going to jail today?" Lawrence replied that he would at some point, but that it would not necessarily be that day, stating that they could "put you up tonight if we need to if it's taking us time to get to the point where we can get all this stuff worked out." Lawrence explained that defendant would be kept overnight at the police station. Then the following exchange occurred:
"[DEFENDANT]: Okay, so is there a possibility like, after a little while, can I make a couple of phone calls?
"LAWRENCE: We need to get through this first before we allow you to make some phone calls.
"HOPPER: At some point though.
**11 "LAWRENCE: At some point you will-
"HOPPER: When we're all done-
"LAWRENCE: At some point, you'll be able to.
"HOPPER: Yes.
"LAWRENCE: When we get to the point-
"[DEFENDANT]: Yeah, 'cause my-
"LAWRENCE: -where we're working together on this, yes, we can allow you to-
"[DEFENDANT]: Okay.
"LAWRENCE: -use the phone.
"[DEFENDANT]: Cause my sister, this is her second time calling.
"HOPPER: Oh, yeah?
"[DEFENDANT]: So Dejaunay must've called her.[8 ]
"HOPPER: Well, sure.
"[DEFENDANT]: Yeah, right after I left out.
"HOPPER: Of course.
"LAWRENCE: Um-hm. And that's the thing is we want you to be able to make that phone call. But we need to start making some progress with this in order to do that because we don't want to have to explain to your family what's going on.[9 ] It's better that you s-, put it in your words.
"[DEFENDANT]: Yeah.
"LAWRENCE: Do you know what I mean?
"[DEFENDANT]: Yeah.
"LAWRENCE: Because that-that's just an awkward place for all of us to be. It's better that you do it, than we do **12 it. Then, once we've worked through some of these things, then it's, it's easier for everybody.
"HOPPER: We're gonna give you the opportunity to talk to your family.
"LAWRENCE: Ample-
"HOPPER: That's for sure.
"LAWRENCE: -opportunity.
"[DEFENDANT]: Uh-huh.
"HOPPER: We will give you an opportunity to (undiscernible).[10 ]
"[DEFENDANT]: Who I-all I need to do is call my sister. Like I said, she worries.
"HOPPER: Yeah.
"[DEFENDANT]: You know, especially with my health and stuff like that. Dejaunay probably made it sound a lot worse than-
"HOPPER: More dramatic?
"[DEFENDANT]: Yeah.
*1074 "LAWRENCE: Yeah.
"[DEFENDANT]: You know, oh they came and they took him away.
"HOPPER: Yeah.
"[DEFENDANT]: Then [my sister Kawana's] like, 'what? Oh hell no. Okay, let me call this person, let me call that person, let me ...'
"HOPPER: Oh, I'm sure.
"[DEFENDANT]: And before I know it, it's all over town. Well, I'm about ready to go.
"LAWRENCE: Okay.
**13 "[DEFENDANT]: I don't feel good, I and some of it, I don't remember all of them. I-I really don't.
"LAWRENCE: Okay.
"[DEFENDANT]: You know, but the girl in the house, I do remember that."
D. Interrogation After the Second Cigarette Break on October 15
After the second cigarette break, defendant and the detectives returned to the interrogation room. Defendant was shown more pictures and maintained that he did not remember two of the victims, but he acknowledged that he did recognize AA. Defendant said:
"I met her at Irvington Park. It was during the middle of the day um, I was sitting over by the playground and uh, it was me and a couple of friends and I think uh, two of [my] nephews 'cause I was watching them play. She came over and we started talking and everything was going pretty good so I, I told her I'd meet her again later on in the park, you know after I got, took the kids back home and, you know, got all that stuff situated. Uh, we met at the park and she was the one that recommended the house."
Defendant said that the victim knew which door was open at the house, and that he did not know what set him off, "But I know I did kill her. I think I strangled her. I think that's what I did." Lawrence asked him how, and defendant thought maybe it was with his hands. Lawrence offered to show defendant a different picture, "because there's a piece of her clothing that's kind of involved," and asked if that helped him remember. Defendant guessed "her shirt," then "her belt," and Lawrence offered that defendant could be "mixing the details up" and confusing that murder with a different one. He then asked if defendant remembered her shirt, and defendant offered that he thought it was dark colored. Lawrence then asked if there had been an incident where he had used a shirt and not just his hands to strangle someone. Lawrence asked if defendant remembered a weapon like a knife, and defendant offered that "I killed her with it, I, I believe." Lawrence then told defendant that AA had been strangled but had other injuries as well. He added that they would go through the other victims' injuries with **14 defendant, showing him "harder photographs" to help them understand "how things happened with them and why you left them in the state you did." The detectives then took a lunch break, providing defendant with a sandwich, leaving him in the interrogation room, but taking his phone with them.
After the lunch break, Lawrence returned to the topic of AA, and defendant suggested that he might have been drunk or high, explaining that, at that point, he had been getting drunk every day and using a lot of cocaine. He emphasized that he could barely remember what happened the previous day or his mother's birthday, much less something that had happened more than 30 years earlier. Lawrence then went over photographs from the location where AA had been found, asking defendant about various things depicted in the pictures and pointing out various details. Lawrence asked defendant about how many other times he had done things like this. Defendant said that he did not know, and Lawrence suggested that there might be as many as seven victims. The detectives went over photographs of different crime scenes, asking defendant if he remembered various aspects of the crimes depicted, but defendant maintained that he had no memory of them. Lawrence said that defendant knew there was more than one victim, and defendant responded, "Yeah it must be more than one." Defendant said he thought about his crimes once in a "blue moon," which he described as when his head *1075 was clear, when he was not drunk, and when his medication had not "kicked in." Defendant maintained throughout the day that he had no memory of the other crimes, although he acknowledged being familiar with some of the areas where the bodies were found.
At various points throughout the afternoon, the detectives suggested that, because defendant had already confessed to one murder, he was likely to spend the remainder of his life in prison, and there was no reason not to confess to additional crimes. Defendant continued to deny any memory of additional crimes. At some points, the detectives returned to a more aggressive or hostile approach, asserting that they were able to tell that defendant was lying and that he **15 was "messing with" them. The detectives described various scenarios of how they believed the crimes might have happened, but defendant expressed considerable doubts about the detectives' speculations. The detectives also returned to the theme of helping the victim's families. Defendant acknowledged, "I have to remember what I did" and said he was doing his best, but he still had no memory of the crimes. He attributed his lack of memory to drug use and blackouts. Detective Lawrence said that he was disappointed in defendant for failing to confess to additional crimes. That day's interrogation concluded at about 6:00 p.m., and defendant was held at the police station that night. His medications had been retrieved from his home during the interrogation, so he was able to take them that evening.
E. Interrogation on the Morning of October 16
The interrogation resumed the following morning at approximately 8:30. Lawrence told defendant that, before they started the booking process, he would have a chance to call his family. Defendant said that he wanted to call his mother and sister. Lawrence told him that he would be allowed to make the calls but would need to make them on a speaker phone to make sure that he and his family were not devising an escape plan. Lawrence assured defendant that the detectives would not talk during the calls. The detectives did not arrange for defendant to make the requested calls immediately, however. Instead, they continued to interrogate him.
Lawrence brought out the form that defendant had signed the day before, waiving his Miranda rights, and asked if defendant remembered it. Defendant confirmed that he did, and that he understood his rights. The detectives then proceeded along the same lines as they had the previous day. Lawrence stressed the strength of the state's evidence, the need for the victims' families to know what had happened, and that the "absolute worst that could happen" for defendant was for him not to tell them about the crimes "up front," which would "actually put [defendant] in a much better position, the way the community would view [him], the way these families would view [him]." Defendant repeated that he did not remember any victims other than AA and "I
**16 can't just say, okay I did something and I don't even know if I did it or not." The detectives again went over with defendant the details of the various crimes scenes, but, although defendant acknowledged some familiarity with some of the areas, he maintained that he did not remember the crimes. At various points, the detectives told defendant that they were certain of his guilt, that he was trying to "game" them, and that, by failing to admit to additional crimes, he had "torpedoed" himself, and that he "would regret this."
The detectives showed defendant a video of AA's mother, thanking defendant for admitting having killed AA, as well as a video of LW's son, in which he asked defendant to "talk to these detectives about my mom and admit[ ] that you killed her." Hopper asked defendant what he would tell his own family, and he replied that he would tell them what he knew and what he had done. Defendant ultimately acknowledged that he may have committed two of the other crimes, but that he had no memory of them. The detectives asked if they could tell the families that he acknowledged responsibility for those murders, and defendant said no, because he was not sure if he had committed those crimes.
Defendant then asked for a cigarette and bathroom break, and Lawrence told him that he would be allowed to take the break and *1076 use the telephone afterward. When defendant returned the from the break, Lawrence indicated that another officer-who apparently had been with defendant during the break-thought that defendant had something to tell them.[11] Defendant referred to the EJ murder, stating that he "may have done that one." Defendant said, "I don't know if I rolled her down, threw her down or whatever, I-that's something I don't know. You know I can't remember it."
F. Defendant's telephone calls
The detectives then allowed defendant to call his family on a speaker phone. Defendant left a voice mail for his mother that he was being booked for murder, and Lawrence interjected, "aggravated murder." Defendant's mother called back and he spoke briefly with her, indicating that he was **17 being held for murder. She expressed disbelief and said that she would text defendant's sister. A call was then placed to defendant's sister, and defendant told her that he was in jail for murder for something that he did in 1983. He said, "Yeah, I did one, uh, the others I'm not sure about." His sister asked if he was hallucinating and if he had been up all night. Defendant said he had had a "little bit of sleep last night." His sister asked who the victim was, and Hopper interjected that it was a 14-year-old girl. The sister asked defendant if someone had made him say this, and defendant replied, "No." She asked if defendant had his attorney there, and defendant said he did not. His sister asked, "how can you say yes to something if you don't have an attorney?" Defendant replied, "Because I did it." His sister said, "I think you may have just been up too long and badgered too long and probably agreed to anything." His sister then talked to the detectives and asked about defendant's lack of representation. They told her that he had agreed to talk to them without an attorney. The sister explained that she had been trying to find out what was happening at the police station all night, and added that, in light of defendant's health problems, "he could probably say anything." After the call was completed, Lawrence told defendant that he should make sure to "be honest" with his sister about how well they had treated him, "because what I don't want her to do is to get herself so worked up that we did something bad to you."
Shortly thereafter, defendant was booked into the jail, and he was charged by indictment later that day with 12 counts of aggravated murder.
G. The Trial Court's Rulings
Defendant moved to suppress evidence of his admissions. He argued, in pertinent part, that suppression was warranted in light of case law interpreting ORS 136.425 and Article I, section 12, of the Oregon Constitution. At the conclusion of the hearing on defendant's motion to suppress, the trial court made oral observations about what had occurred, characterized aspects of the interrogation, and determined that evidence of defendant's statements during and following the second cigarette break on October 15 should be suppressed. The court concluded:
**18 "I am finding that the State has not met its burden of proof in this case when it comes to ORS 136.425.
"I believe that when I consider the totality of the circumstances, many of which I've already discussed, but the length of time that the defendant was subject to interrogation; the fact that he was told repeatedly and clearly that he would be found guilty and that there was [u]ncontroverted proof of his guilt; the fact that he was not only given indications that the police would assist him, that it would be better for him, and that they would actively-not that it would just be a natural consequence of his continuing to deny his involvement or continue to state he doesn't remember-it wasn't just that the natural consequence would be a certain thing, but the police would actively work to make things as bad as possible for him, which I think is very different than what you see in some circumstances where somebody is just told, 'Hey, if you don't admit, then this will happen.' It's like, 'If you don't admit, then you will be considered a monster; we *1077 will consider you a monster; and we will actively work to make this as bad as possible for you.'
"When I consider all those things together, the fact that he was cut off from his family, by itself wouldn't mean anything. But when he was essentially told that, 'You're not going to have contact with your family,' and the flip side is, 'We will let you have contact with your family if we're working together," all of these things by themselves would not have been enough. But given the totality of the circumstances, what I consider to be a very close call, I feel the State has not met its burden.
"By convincing the defendant that he would be found guilty regardless of whether he remembered killing anyone, he could have easily considered it for the better to confess regardless of whether he had a memory of killing. Or he could have concluded that he murdered the victim-it could very well in this case have been that he murdered the victim in the case in which he had limited memory of her and the place of her murder.
"And I've got to tell you, although I don't need to make a finding that his confession was false or wrong, and I'm not doing that now, it sure appears that the defendant became convinced that he must have committed murders that are-one plausible thing here is that he became convinced that he committed the murders of which he had no memory, **19 and so he took responsibility for the one where he had some memory, at least of the person and the place.
"And the fact that the defendant remembers [AA] or remembers being at a place where she took johns does not-obviously does not mean that he committed murder on this particular date 30 years ago-34 years ago.
"He definitely-when I consider the totality of circumstances, I believe that it could have-the defendant could have started to believe that he would suffer a number of detrimental consequences, including the judge and jury would consider him to be a monster, the police would seek their longest possible penalties; the victims would be angry and influence the prosecution negatively.
"It might also have been reasonable for him to believe that the interview might not end until he cooperated, and that he would not *** be able to let his family know what was going on.
"There was no inducement of immunity in this case. But there was an inducement that the police would help him or that the case would be helped at times; and at other times, obviously a hostile threat that bad things would happen. Police threatening a worse punishment if convicted I believe is coercive."
The court then went on to further express why it viewed defendant's confession as problematic, again noting defendant's ongoing lack of memory and providing incorrect details of AA's murder. The court observed that it is a legal and common interrogation technique to lie to defendants about the strength of the state's case, but also noted the downside to that technique: that having convinced a defendant of the inevitability of his conviction, "there is much more of a risk that-when the police then start threatening and inducing with leniency-that it is going to be the type of thing that will have much more of an influence on the defendant." Or, as the court put it, if a defendant thinks that he has no chance of prevailing in court, he "is much more susceptible to being under the influence of threats and inducements because it's a little bit of 'what harm will it do for me to confess?' " The court also concluded that showing defendant his Miranda waiver form on the second day did not "dispel the taint on the first day," and, to the extent that **20 defendant made any admissions during the interrogation before the phone calls on the second day, those too should be suppressed. The court therefore granted defendant's motion to suppress admissions made during the interrogation.
The court then turned to the parties' arguments about whether defendant's telephone admission to his sister that he had committed a murder, made immediately after the interrogation on the second day, also should be suppressed. The court observed that the interrogation *1078 on the second day had proceeded similarly to that on the first day and, that, although defendant was shown his Miranda waiver form, he was not given new Miranda warnings. The court noted that the detectives continued to emphasize the strength of their case and told defendant that the "worst thing that could happen" was defendant failing to admit his involvement in other murders, that he had "torpedoed himself" by failing to make further admissions, and that he would "regret this." The court observed that defendant also was told during the interrogation to think about what he would tell his family later that day. Ultimately, the court concluded that defendant's admission to his sister should be suppressed. The court noted that the detectives had interrogated defendant up to the time when they allowed him to call his family, that the detectives had participated in the calls, and that defendant had understood before he made the calls that the interrogation would continue after the calls were completed. Thus, the court explained, the coercive influences of defendant's first admissions were not dispelled. The court concluded that defendant's admission made during the telephone call should be suppressed.
II. ANALYSIS
The legal question that the state raises in this interlocutory appeal is whether the trial court erred in concluding that the state failed to prove that defendant's statements during and after the second cigarette break on October 15, as well as his admissions on October 16, were voluntary. ORS 136.425(1) provides that "[a] confession or admission of a defendant, whether in the course of judicial proceedings or otherwise, cannot be given in evidence against the defendant when it was made under the influence **21 of fear produced by threats." Similarly, under Article I, section 12, of the Oregon Constitution,[12] the voluntariness of an admission or confession depends on whether or not, in the totality of the circumstances, a defendant's free will was overborne and his or her capacity for self-determination was critically impaired. State v. McAnulty , 356 Or. 432, 459, 338 P.3d 653 (2014) (citing State v. Acremant , 338 Or. 302, 324, 108 P.3d 1139 (2005). This court has recognized that both the statute and Article I, section 12 embody the common-law rule that confessions made by a defendant in custody that were " 'induced by the influence of hope or fear, applied by a public officer having the prisoner in his charge,' " are inadmissible against the defendant. State v. Powell , 352 Or. 210, 218, 282 P.3d 845 (2012) (quoting State v. Wintzingerode , 9 Or. 153, 163 (1881) ); see also State v. Smith , 301 Or. 681, 690, 725 P.2d 894 (1986) ("We know of no case that interprets or applies ORS 136.425 independently of the common-law rules on confessions and admissions.")
Voluntariness is a question of law for this court. State v. Terry , 333 Or. 163, 171, 37 P.3d 157 (2001), cert. den. , 536 U.S. 910, 122 S.Ct. 2368, 153 L.Ed.2d 189 (2002). This court reviews the voluntariness of defendant's statements anew, but is bound by the trial court's findings of fact if supported by the record. Id. To the extent that the trial court did not make express findings, this court will presume that the court decided the facts in the light most favorable to the defendant, who prevailed below. Ball v. Gladden , 250 Or. 485, 487, 443 P.2d 621 (1968). "It is well established that confessions are initially deemed to be involuntary and that the state has the burden to overcome that presumption by offering evidence affirmatively establishing that the confession was voluntary." State v. Powell , 352 Or. at 225-26, 282 P.3d 845 ; see also State v. Stevens, 311 Or. 119, 137, 806 P.2d 92 (1991) (state must prove voluntariness of a defendant's statement by a preponderance of the evidence). The provision of Miranda warnings is not a guarantee that statements made after the warnings are voluntary. See McAnulty , 356 Or. at 459, 338 P.3d 653 (considering whether coercive tactics rendered a defendant's post-Miranda statements involuntary); State v. James , 339 Or. 476, 488-89, 123 P.3d 251 (2005) (rejecting **22 argument that statements made after waiver *1079 of Miranda rights are presumptively admissible).
Thus, the question for our consideration is whether the state met its burden to prove that defendant's free will was not overborne and his capacity for self-determination was not critically impaired, and that he made his statements without inducement from fear or promises. Those issues are interrelated and, as the trial court explained, we must look to the totality of the circumstances in reaching a legal conclusion about the voluntariness of defendant's statements. However, we find it helpful to begin with the issue of whether the officers who interrogated defendant induced him to make admissions by the influence of hope or fear.
On that issue, both parties rely in significant part on this court's decision in Powell. The facts in that case are not similar to those presented here, and we therefore do not recount them in detail, other than to note that, in Powell , fairly extensive suggestions of leniency were made. What we can learn from Powell , however, is that this court has long recognized that confessions made as a result of such inducements are not reliable. In Powell , the court began, as we will, with Oregon's first case on point, Wintzingerode , in which a defendant in custody made incriminating statements after an officer told him that it " 'would be better for [him] to tell the whole thing.' " Powell , 352 Or. at 218, 282 P.3d 845 (quoting Wintzingerode , 9 Or. at 162 ). In concluding that that statement constituted an improper inducement, this court observed:
"There seems to be no conflict among the numerous authorities as to the rule, that confessions made by a prisoner while in custody, and induced by the influence of hope or fear, applied by a public officer having the prisoner in his charge, are inadmissible in evidence against him.
"The precise form of words in which the inducement is presented to the prisoner's mind is immaterial. It is sufficient if they convey to him the idea of temporal benefit or disadvantage, and his confession follows in consequence of the hopes thereby excited."
Id. at 163 ; see also Powell , 352 Or. at 218, 282 P.3d 845 (quoting same). In Powell , the court then explained that that rule against the **23 admission of confessions made as a result of inducements-promises or threats-arose from the understanding that such confessions are not reliable: "As our cases consistently have recognized, confessions are unreliable when rendered under circumstances in which the confessor perceives that he or she may receive some benefit or avoid some detriment by confessing, regardless of the truth or falsity of the confession." Id. at 222, 282 P.3d 845 (citing cases). Thus, the court said, a court must make "an individualized inquiry into whether the alleged inducement was sufficiently compelling to influence defendant's decision to confess." Id. at 223, 282 P.3d 845.
In Powell , as well as in an earlier case, State v. Ely , 237 Or. 329, 390 P.2d 348 (1964), this court focused on the coercive effects of statements that implied that the defendant could avoid prosecution by confessing. Powell , 352 Or. at 223-24, 282 P.3d 845 ; see also Ely , 237 Or. at 334, 390 P.2d 348 (where defendant's employers warned him that they could not guarantee he would not be prosecuted, but that they did not intend to pursue a prosecution, that assurance "amount[ed] to the offering of an inducement and weaken[ed] the effect of any warning that the confession could be used against him"). As the state points out, such assurances were not present here. The detectives told defendant that he would be charged with murder, and they did not imply that there was anything he could do to avoid prosecution.
The hope of avoiding prosecution is not, however, the only inducement that may render a confession involuntary. The case of State v. Linn , 179 Or. 499, 173 P.2d 305 (1946), is illustrative. In Linn, the defendant had been arrested for rape and was interrogated by two police officers. One of the officers told the defendant that he was "in a tough spot," that another man involved in a similar offense had been sentenced to seven years in prison, and that it was the defendant's "best bet" to admit the crime and "throw himself on the leniency of the Court." Id. at 504, 173 P.2d 305. When asked whether he had told the defendant whether making a *1080 confession "would be better" for the defendant, the police officer answered that he had not told the defendant that it would be better, but that "it might be." Id. The officer acknowledged that "I told him I felt he would get a better deal if he walked **24 in and pled guilty." Id. at 506, 173 P.2d 305. The defendant testified that the officers had convinced him "that I was in an impossible predicament and that they were my friends and telling me the best thing to do." Id. The defendant also testified that one of the officers told him, if he "wanted to do it the hard way," that "they would fight [him] to the last inch." Id. at 506-07, 173 P.2d 305.
In analyzing those facts, this court acknowledged the rule of law from Wintzingerode , but drew a distinction between permissible "mere adjuration" and "adjuration accompanied by inducement." Linn, 179 Or. at 510, 173 P.2d 305 (citations omitted). The court noted that it had upheld confessions in circumstances where defendants had been told, as a general matter, that it would better if they told the truth, or that they would feel better if they told the truth, concluding that "[t]he real question is whether the language used in regard to speaking the truth, taken in connection with all the attending circumstances shows the confession was made under the influence of some threat or promise." Id. at 512, 173 P.2d 305. The court concluded:
"In the case at bar, the question does not relate to a mere adjuration to tell the truth, nor to a mere statement that it would be better to tell the truth. The inducements went much further and were calculated to induce a confession of guilt. In addition to the specifically undenied testimony of the defendant that if defendant did it 'the hard way' they would fight him to the last inch, the testimony of the officers themselves discloses a subtle attempt to instill in the mind of the defendant (1) fear of a seven year sentence and of official hostility if he refused to confess and (2) expectation of leniency if he admitted the crime."
Id. at 512-13, 173 P.2d 305. The observations in Linn are consistent with the statement in Wintzingerode that an impermissible inducement is one that conveys to a defendant the idea of a threat or promise. 9 Or. at 163.
The state argues that, in this case, the detectives hewed to permissible inducements, describing their interrogation as involving three basic themes: helping the victims' families; relieving defendant's psychological or spiritual burden of having committed the crimes; and describing **25 the legal ramifications of defendant's failure to confess. All three of those themes were present throughout the interrogation, and we agree with the state that the first two of those themes-essentially, relieving defendant's conscience and easing the suffering of the victims' families-are not the sort of themes that have concerned this court in the past. Using the terms of Linn, those themes do not imply "adjuration accompanied by inducement" but rather are permissible "mere adjuration." Linn, 179 Or. at 510, 173 P.2d 305.
The same cannot be said, however, of the detectives' statements concerning the legal ramifications of defendant's failure to confess. We reiterate some of the relevant facts, moving from the fairly benign to the more legally significant statements. The detectives told defendant that: (1) "everything would turn out best for everybody" if defendant confessed; (2) they were trying to "help" or "save" defendant by encouraging him to confess; (3) by way of analogy, that if defendant did not confess, defendant would be "run over" by a train, whereas, if he confessed, he would be a passenger on the train and "have some control over [his] future"; (4) they were investigating additional murders and that defendant needed to tell them when he stopped murdering women, implying that if he did not, he would become a suspect in additional murders; (5) the jury would hear irrefutable evidence that defendant committed the crimes and would react badly if defendant could not explain the evidence or if he claimed he could not remember the crimes, and would assume that he couldn't remember because he had committed so many murders; (6) the detectives themselves, as well as the victims' families and ultimately the jury, would view defendant as a "monster" unless he confessed; and (7) if defendant did not confess, the detectives would do everything *1081 they could to ensure that he received a harsh sentence.
In addition, the detectives also made some significant statements to defendant about how the interrogation itself would proceed. The detectives stated that: (1) they were giving defendant his only significant chance to confess because anything he said later would sound as if he were "cooking a story"; (2) they were prepared to continue the interrogation all day and into a second day; and (3) they **26 would be "working together" with defendant at the point when he told them what he remembered about the crimes, and that he would not be permitted to talk to his family until they had "worked through some of these things."
The state maintains that, under the circumstances of this case, those statements did not rise to the level of impermissible inducements under ORS 136.425 for two reasons. First, the state notes that, before any of those statements were made, defendant was given Miranda warnings, and defendant did not assert his right to remain silent or argue that he did not understand that right. The state is correct that Miranda warnings are, in essence, a prophylactic measure to try to ensure that a defendant's decisions made while in custody are made voluntarily, and that, if a defendant is not informed of the right to remain silent, the statements that a defendant makes will be deemed involuntary and be suppressed. See, e.g., State v. Vondehn , 348 Or. 462, 467-69, 236 P.3d 691 (2010) (so noting). But Miranda warnings are not a guarantee that statements made after the warnings are voluntary. See McAnulty , 356 Or. at 459, 338 P.3d 653 (considering whether coercive tactics rendered a defendant's post-Miranda statements involuntary). If interrogators make impermissible inducements, a confession is unreliable and inadmissible, even when it follows a Miranda warning. We agree with the state that the fact that defendant was given Miranda warnings is an important factor in an analysis of whether-under the totality of the circumstances-defendant's will was overborne, but it is not determinative in an analysis of whether defendant was induced to speak by hope or threat of temporal benefits or disadvantages.
The state's second argument on that front is that this is not a case in which the detectives either implicitly or explicitly suggested that defendant could escape prosecution by confessing. Rather, it is undisputed that, before defendant's admission, the detectives had assured him not only that he would be charged with multiple murders, but also that he would be booked into jail after the interrogation concluded. The state reasons that the detectives' statements about the legal significance of defendant's silence amounted to no more than explaining to him the legal consequences of **27 the situation in which he found himself and that such explanations are permissible.
The trial court viewed the interrogation as going further, however. The court explained that defendant "was not only given indications that the police would assist him, that it would be better for him, and that they would actively-not that it would just be a natural consequence of his continuing to deny his involvement or continue to state he doesn't remember-it wasn't just that the natural consequence would be a certain thing, but the police would actively work to make things as bad as possible for him." In that regard, this case is similar to Linn . There, the defendant was told that the best thing for him to do-not just best in the moral sense but in the practical sense of how the case against him would proceed-was to confess. 179 Or. at 504-05, 173 P.2d 305. An officer suggested to the defendant not only that it would be best to confess, but that, if he did not confess, he was likely to get a lengthy prison sentence, and the police would fight him "to the last inch." Id. at 506, 507, 173 P.2d 305. Similarly, in the present case, defendant was told that it would be best for him to confess so that the detectives might eliminate him as a suspect in additional crimes and because it would give him more control over how the case would proceed in the future; that the jury would think poorly of him if he did not confess; and that if he did not confess, the detectives would do their best to ensure that he received the maximum possible sentence. Defendant was also told that the detectives were prepared to continue to question him until they were "working together" and that *1082 he would not be permitted to talk to his family until they had "worked through some of these things." As the trial court recognized, those are the types of statements that are potentially problematic under ORS 136.425 because they conveyed to defendant that he "may receive some benefit or avoid some detriment by confessing, regardless of the truth or falsity of the confession." Powell , 352 Or. at 222, 282 P.3d 845.
The trial court did not stand solely on that ground, however. It correctly looked to the totality of the circumstances and considered additional evidence about whether defendant confessed voluntarily or whether his will was **28 overborne. We proceed in the same fashion. See, e.g. , State v. Foster , 288 Or. 649, 655-56, 607 P.2d 173 (1980) (considering, in totality of circumstances, police questioning of defendant over the course of two days during which he remained in custody, officers' statements that defendant's predicament was hopeless and that he would benefit if he cooperated); State v. Atkins, 251 Or. 485, 498, 446 P.2d 660 (1968) (confession deemed involuntary where defendant had been placed in cell with dangerous inmate "for the purpose of gaining admissions" from defendant); State v. Garrison , 59 Or. 440, 117 P. 657 (1911) (in evaluating confession and applying rule from Wintzingerode , court made note of defendant's limited mental abilities and detective's method of extracting confession). The United States Supreme Court also takes a "totality of the circumstances" approach that considers characteristics of a suspect as well as aspects of the interrogation, and we look to those cases for guidance. Lego v. Twomey , 404 U.S. 477, 478, 92 S.Ct. 619, 30 L.Ed.2d 618 (1972) ("[C]ourts look to the totality of circumstances to determine whether a confession was voluntary. Those potential circumstances include not only the crucial element of police coercion; the length of the interrogation; its location; its continuity; the defendant's maturity; education; physical condition; and mental health."); see also Miller v. Fenton , 474 U.S. 104, 109, 106 S.Ct. 445, 449, 88 L.Ed.2d 405 (1985) (recognizing that "certain interrogation techniques, either in isolation, or as applied to the unique characteristics of a particular suspect, are so offensive to a civilized system of justice that they must be condemned under the Due Process Clause of the Fourteenth Amendment"); Haynes v. Washington , 373 U.S. 503, 83 S.Ct. 1336, 10 L.Ed.2d 513 (1963) (in determining voluntariness of confession, Court considered that defendant had been held for 16 hours and told he would not be allowed to telephone his wife until he "cooperated" with police).
On appeal in this court, defendant's focus is on both the interrogation techniques that the detectives used and defendant's physical and mental characteristics. Defendant submits that the detectives' interrogation followed the interrogation method that is generally known as the "Reid technique," citing, among other sources, S. Kassin et al., **29 Police Induced Confessions: Risk Factors and Recommendations , 34 Law & Hum Behav 3 (2010). That technique involves isolating a suspect in a small room to increase anxiety; confronting the suspect with accusations of guilt and emphasizing the strength of the evidence against the suspect; offering sympathy and justifications or rationalizations to allow the suspect to minimize the crime; and encouraging the suspect to see confession as a means of terminating the interview. Id. at 3, 6.
Defendant also submits that, in addition to physical characteristics, a suspect's mental illnesses or developmental disabilities may be relevant factors, citing, among other sources, ABA Criminal Justice Mental Health Standards, Standard 7-5.8(b) ("Official conduct that does not constitute impermissible coercion when employed with a nondisabled person may impair the voluntariness of the statements of persons who are mentally ill or mentally retarded."). Defendant points to the fact that, at the time of the interrogation, he was in poor physical health, suffered from schizophrenia as well as depression, and had significant memory loss and a history of blackouts. Defendant argues that, given those characteristics, the detectives' interrogation methods-isolating him and cutting him off from his family, maintaining that proof of his guilt was incontrovertible and that things would be better for him in the course of the prosecution if he confessed and worse for him if he did not, and encouraging *1083 him to see confession as a means of terminating the interrogation-resulted in admissions that were not reliable.
The state's response is two-fold. First, the state contends that the type of personal characteristics that defendant highlights do not bear on the voluntariness of confessions. It asserts that cases that have relied in significant part on the mental characteristics of a defendant in making voluntariness determinations have involved defendants with more significant impairments than those at issue here, such as illiteracy and severe intellectual disabilities, citing as its sole example Culombe v. Connecticut , 367 U.S. 568, 620, 81 S.Ct. 1860, 6 L.Ed.2d 1037 (1961). However, Culombe is not the only Supreme Court case that discusses that issue. In Colorado v. Connelly, 479 U.S. 157, 107 S.Ct. 515, 93 L.Ed.2d 473 (1986), other aspects of a defendant's mental state were deemed relevant to voluntariness. There, a state court had concluded that a confession was involuntary because the defendant was suffering from chronic schizophrenia. The defendant had approached an off-duty police officer and, without prompting, confessed to a murder. The Court noted that the officer had done nothing coercive in securing the confession and concluded that the defendant's mental condition alone did not require suppression of his confession. The Court recognized that,
"as interrogators have turned to more subtle forms of psychological persuasion, courts have found the mental condition of the defendant a more significant factor in the 'voluntariness' calculus. See Spano v. New York , 360 U.S. 315, 79 S.Ct. 1202, 3 L.Ed.2d 1265 (1959). But this fact does not justify a conclusion that a defendant's mental condition, by itself and apart from its relation to official coercion , should ever dispose of the inquiry into constitutional 'voluntariness.' "
479 U.S. at 164, 107 S.Ct. 515 (emphasis added). However, the Court contrasted the facts in Connelly to those in another case in which a defendant's mental condition rendered a confession involuntary- Blackburn v. Alabama , 361 U.S. 199, 80 S.Ct. 274, 4 L.Ed.2d 242 (1960). In Blackburn, the police, who were aware of the defendant's mental instability, exploited his mental problems with what the Court described as "coercive tactics," which included an eight- to nine-hour interrogation in a tiny room and the absence of the defendant's friends, relatives, or legal counsel. Connelly , 479 U.S. at 164-65, 107 S.Ct. 515, citing Blackburn , 361 U.S. at 207-08, 80 S.Ct. 274. We agree with defendant that a defendant's mental condition is a factor that must be considered, as part of the totality of the circumstances, in determining whether a defendant's confession was voluntary.
The state's second argument is that other factors demonstrate that, regardless of defendant's physical and mental condition, his statements to the detectives were clearly voluntary. The state points out that defendant ultimately did not confess to all the crimes about which he was questioned, and that every request that he made was honored, as he was provided with food and water, was given restroom and smoke breaks, and was not subjected to **31 physical violence.[13] The state is correct that those facts, and the fact that defendant spoke after he received and understood Miranda warnings, cut in the state's favor. There are several related facts that cut in the other direction, however. For instance, many of the statements that defendant made were demonstrably or apparently incorrect. Defendant was interrogated in a small room, and the trial court described the interrogation as becoming "intense" and "hostile" at points, a finding that the state does not contest and that is supported by evidence in the record. Defendant was isolated from his family, and, at the time defendant made his first admission, the interrogation already had lasted multiple hours. Thus, although defendant was not subjected to physical violence, he was interrogated in circumstances that were physically and mentally demanding. Of course, the fact that *1084 an interrogation is physically and mentally demanding does not necessarily make the admissions that are adduced involuntary and inadmissible. The type of interrogation that the detectives conducted here resembles the Reid technique described above-and may have been specifically designed to produce a confession, and to do so by putting significant pressure on defendant. But it is the work of detectives to solve crimes, and it may take the application of pressure to secure a voluntary confession. We do not suggest that the use of the Reid technique or other strategies to obtain information from a suspect is necessarily coercive or will always require the exclusion of inculpatory statements. The question that a trial court must decide is not whether a particular interrogation method was used, but whether, considering the totality of the circumstances, the suspect's will was overborne.
The trial court acknowledged that this is a close case. We agree. The detectives who conducted this interrogation were skilled, and they may have succeeded in convincing defendant to voluntarily tell them what happened, to the best of his memory. The detectives did not make any **32 promise of immunity, explaining that, no matter what defendant said, he would be charged with murder. They informed defendant of his right to remain silent and to consult with counsel, and he requested, and they permitted, cigarette and bathroom breaks. At times, the detectives' interrogation may have been hostile, but it was not consistently so. For the most part, the detectives' interrogation appealed to defendant's better nature and encouraged him to help the families of the victims. On the other hand, defendant is a schizophrenic who experienced delusions in the past, and who takes medication for depression and high blood pressure and to help him sleep. Defendant has significant memory problems. He needs assistance with shopping, cannot drive, and has a limited ability to walk. His limitations are so significant that he receives disability services and has a live-in care provider. The detectives isolated defendant from his family, removing his cell phone and not permitting him to make calls, despite his request to do so. Although defendant denied any memory of the murders, perhaps due to his history of drug and alcohol use and resulting blackouts, the detectives continued to question him for a significant length of time and told him that they would continue to do so until they were "working together." When they had "worked through some of these things," the detectives explained, they would permit defendant to talk to his family. The detectives told defendant that it would be best for him to confess so that the detectives might eliminate him as a suspect in additional crimes and because it would give him more control over how the case would proceed, observing that, if defendant did not confess, they would do their best to ensure that he received the maximum possible sentence. Viewed independently, none of those factors would be dispositive, but together they indicate that the detectives' methods and inducements may have persuaded defendant to tell the detectives what they wanted to hear, whether or not that was the truth. Considering the totality of the circumstances, we agree with the trial court; the state has not convinced us that defendant's admissions during and after the second cigarette break on October 15 were voluntary.
We turn now to the state's argument that, even if the trial court correctly suppressed defendant's statements **33 made during the detectives' interrogation, it nonetheless erred in concluding that defendant's admission during his call to his sister after the interrogation concluded need not be suppressed. As explained below, we conclude that the trial court correctly suppressed that admission as well.
In Powell , we addressed a similar issue and, again relying on Wintzingerode , concluded that a second set of statements concerning the same matter should have been suppressed based on the violation of ORS 136.425. We stated:
"[T]he statute itself requires exclusion of the second set of statements unless the state proved that the improper coercion that compelled the first set of statements had been dispelled before the second set of statements were made. We derive that standard from the court's construction of the statute in Wintzingerode :
*1085 " '[A]lthough an original confession may have been obtained by improper means, yet subsequent confessions of the same or of like facts, may be admitted, if the court believes that from the length of time intervening, or from proper warning of the consequences of confession, or from other circumstances, that the delusive hopes or fears, under the influence of which the original confession was obtained, were entirely dispelled. *** [I]n the absence of any such circumstances, the influence of the motives proved to have been offered will be presumed to continue and to have produced the confession, unless the contrary is shown by clear evidence, and the confession will therefore be rejected.' "
Powell , 352 Or. at 227, 282 P.3d 845 (ellipsis in original; quoting Wintzingerode , 9 Or. at 164-65 ). We explained that "confessions made subsequent to an improperly induced confession on the same subject are presumptively inadmissible under the statute." Id. To overcome such a presumption, the state must offer "clear evidence" that, at the time of the later confession, "the delusive hopes or fears, under the influence of which the original confession was obtained, were entirely dispelled." Id. (quoting Wintzingerode , 9 Or. at 165 ).
In Powell , after the defendant had made admissions to agents of his employer, the agents asked him to repeat his admissions to a police officer, which he did. 352 Or. at 214-15, 282 P.3d 845. The state argued that, because the defendant had **34 been Mirandized by the police officer before the second set of statements, they did not need to be suppressed. This court rejected that argument, noting that in that circumstance, "Miranda warnings have significance only to the extent that they in fact had an appreciable effect in dispelling the operation of the prior coercive influences on defendant's mind." Id. at 229, 282 P.3d 845. But, if "the context or manner in which the officer gives the warnings downplays or minimizes their significance in defendant's mind, their effectiveness in serving as a causal break" may be compromised. Id. In that case, the warnings had been presented as a matter of "housekeeping," and a "formality," and thus did not create a causal break. Id.
In the present case, the state argues that three factors establish that the effects of improper coercion had been dispelled: (1) nearly a day had passed since defendant had made his first compelled admission; (2) defendant's Miranda warnings had been "renewed" on the second day; and (3) one of the coercive factors-defendant's ability to talk to his family-had been removed.
Turning to the state's first argument, we disagree that the key element of timing here concerns the time between defendant's first admission and the telephone call. In its initial ruling, the trial court did not simply suppress the first inculpatory statement defendant made. Rather, it suppressed statements made throughout the two-day interrogation, which continued up to the time when defendant was permitted to call his family. There was no significant break between the interrogation and the telephone call to defendant's sister. It would be fair to say that the telephone call, while not precisely interrogation itself, was a part of the detectives' ongoing efforts to get defendant to take responsibility for the crimes. During the interrogation, the detectives talked at several points about what defendant might say to his family about the crimes and told him that he was not being allowed to call them at an earlier point because it would be "awkward" to explain to them before defendant had "worked through" things with the detectives. The phone call itself was placed by one of the detectives and was put on speakerphone so that the detectives could listen in. And, as noted above, both detectives participated in the process by **35 providing information over the phone. The passage of time between the first admission and the telephone call is of little significance here, given that defendant was kept at the police station the entire time, and was subject to lengthy and intense interrogation between the first admission and the telephone call.
As for the state's argument that defendant received renewed Miranda warnings on the second day, the circumstances here, as in Powell , show that the significance of that warning was downplayed. Indeed, the warnings were only "given" on the second day in *1086 the sense that the detectives "gave" defendant the piece of paper he had signed the previous day that contained the Miranda warnings, and asked him if he understood his rights. The detectives did not tell defendant what those rights were on the second day. Warnings that are "given" in this manner are unlikely to "have an appreciable effect in dispelling the operation of the prior coercive influences on defendant's mind." Powell, 352 Or. at 229, 282 P.3d 845.
Finally, we reject the state's argument that defendant's ability to call his sister dispelled the prior coercive influences. As described above, the coercion did not only involve withholding the ability to make telephone calls-that was but one of the significant factors in the totality of the circumstances here. Moreover, defendant did not simply choose to call a relative and confess after the interrogation had ended. Rather, the call was part of the inducement of the earlier admissions, and, ultimately, was carried out in the interrogation room, with the interrogating detectives placing, listening in on, and participating in the call.
The trial court did not err in determining that the state had failed to establish that the improper coercion that compelled defendant's admissions during the interrogation had been dispelled before the telephone call was placed to defendant's sister.
III. CONCLUSION
In sum, we conclude that the trial court did not err when it entered orders suppressing defendant's statements made to the detectives during his interrogation as well as **36 his admission to his sister during the telephone call at the conclusion of the interrogation.
The orders of the circuit court are affirmed.

The first and second cigarette breaks were audio recorded, and the recordings are, at times, hard to understand. The trial court made findings concerning the significant parts of the audio recordings, and those findings are not disputed on appeal.

Defendant's nephew Dejaunay had been present when detectives had arrived at defendant's residence to take him to the police station that morning.

Evidence was presented at the hearing that defendant's family tried throughout the two days during which defendant was being interrogated to find out from police what was happening to defendant, and were told that the police were almost through questioning him and that he would be released soon.

Defendant initially contended that the indiscernible portion of the recording referred to a lawyer, but Hopper testified at the suppression hearing that she had not referred to a lawyer, but to defendant's family. The trial court credited her testimony in that regard.

The record does not contain a recording of that break.

Article I, section 12, provides, in part, that "[n]o person shall *** be compelled in any criminal prosecution to testify against himself."

The absence of physical violence during the interrogation is not, strictly speaking, a part of the "totality of the circumstances." Rather, it its presence is dispositive of the issue: A confession obtained through physical violence or torture necessarily must be excluded from evidence based on due process. Brown v. Mississippi , 297 U.S. 278, 56 S.Ct. 461, 80 L.Ed. 682 (1936).