No. 13　　　　March 12, 2026　　　　1

IN THE SUPREME COURT OF THE
STATE OF OREGON

STATE OF OREGON,
*Respondent on Review,*

*v.*

RYAN THOMAS MONACO,
*Petitioner on Review.*
(CC 17CR48942) (CA A177164) (SC S071665)

En Banc

On review from the Court of Appeals.*

Argued and submitted September 5, 2025.

Neil F. Byl, Deputy Public Defender, Oregon Public Defense Commission, Salem, argued the cause and filed the brief for petitioner on review. Also on the brief was Ernest G. Lannet, Chief Defender, Criminal Appellate Section.

Erica L. Herb, Assistant Attorney General, Salem, argued the cause and filed the brief for respondent on review. Also on the brief were Dan Rayfield, Attorney General, and Benjamin Gutman, Solicitor General.

BUSHONG, J.

The decision of the Court of Appeals and the judgment of the circuit court are affirmed.

DeHoog, J., concurred and filed an opinion.

_____
　* Appeal from Multnomah County Circuit Court, Michael A. Greenlick, Judge. 336 Or App 684, 561 P3d 650 (2024).

**BUSHONG, J.**

This criminal case requires us to decide two issues relating to defendant's convictions on two counts of felony murder. The first issue is whether the trial court erred in declining to suppress statements that defendant made during a police interrogation after he was arrested for setting fire to his estranged girlfriend's apartment, killing her two roommates. The second issue is whether Oregon's felony-murder statute, ORS 163.115(1)(b), as applied to defendant violates the Due Process Clause of the Fourteenth Amendment to the United States Constitution. The Court of Appeals concluded that defendant's statements were voluntary and thus admissible, and that the felony-murder statute did not violate defendant's right to due process. *State v. Monaco*, 336 Or App 684, 561 P3d 650 (2024). We allowed review and now affirm on both issues.

As we will explain, our case law regarding the first issue establishes that the ultimate question for the court is, in the totality of the circumstances, whether defendant confessed voluntarily, or his free will was overborne by improper threats or inducements by the police. *State v. Jackson*, 364 Or 1, 430 P3d 1067 (2018). We agree with the Court of Appeals that the trial court did not err in concluding that the state met its burden of establishing that defendant's free will was not overborne; rather, he confessed voluntarily. On the second issue, we conclude that the felony-murder statute, ORS 163.115(1)(b), as interpreted in *State v. Blair*, 348 Or 72, 228 P3d 564 (2010), did not violate defendant's constitutional right to due process.

## I.   FACTS AND PROCEEDINGS BELOW

The facts that are relevant to our review are those related to the trial court's denial of defendant's motion to suppress. We review a trial court's ruling on a motion to suppress for errors of law. *State v. Ehly*, 317 Or 66, 75, 854 P2d 421 (1993). Whether a confession was voluntary is a question of law. *Jackson*, 364 Or at 21. In reviewing that question for legal error, we are bound by the trial court's factual findings if there is constitutionally adequate evidence to support them, and we "presume that the facts were decided

in a manner consistent with the court's ultimate conclusion" if the trial court did not make express findings. *Ehly*, 317 Or at 75. We summarize the facts from the trial court record in accordance with that standard.

A.  *Historical Facts*

Defendant began dating TM in 2013, and they lived together in an apartment at various times from 2013 to 2017. Their relationship was volatile. In April 2017, TM sought and obtained a restraining order, alleging that defendant had assaulted her. Nevertheless, TM continued to see defendant and she frequently invited him to the apartment despite the restraining order. TM lived in the apartment with two roommates, J and T.

On July 22, 2017, defendant and TM went to a bar together and they got into an argument. Defendant eventually drove TM home, and he entered her apartment to use the bathroom. Fearing that their encounter was going to "get ugly," TM left while defendant was in the bathroom and returned later that night to see whether defendant was still at the apartment. As she drove into the parking lot, defendant rear-ended her car with his car. TM drove away, but defendant followed and struck her car multiple times as they drove on the freeway. TM eventually slammed on her brakes, and defendant kept driving. TM called 9-1-1 to report the incident and drove to her sister's house.

Defendant returned to TM's apartment and repeatedly called and texted TM, begging her to return to the apartment. During one of those calls, he told TM that he was going to drench her couch in gasoline and light it on fire. He told TM that he would videocall her so that she could watch him pour the gasoline. A short while later, defendant called TM and told her that he was "really sorry," that he had "really fucked up," and that he was going to take his own life. A couple of minutes later, TM received a text message from her other sister stating that TM's apartment was on fire. Surveillance footage from a neighboring property captured video images of defendant leaving TM's apartment as the fire erupted.

The fire spread quickly. TM's roommates, J and T, had been asleep in an upstairs bedroom at the time; they died in the fire, along with a dog and three snakes. An arson investigator determined that the fire had started in the living room after someone had poured accelerant on the couch. The police arrested defendant following a brief pursuit three days after the fire. After the arrest, defendant was taken to the hospital for medical treatment. He was released from the hospital around 1:00 a.m. and taken to jail, where he spent the night.

B.  *The Interrogation*

Around noon the following day, Detectives Michaels and Luiz took defendant to an interrogation room at the jail. Michaels advised defendant of his *Miranda* rights, and defendant stated that he understood his rights and agreed to speak with her. The interrogation lasted about four hours.

Michaels began by asking defendant biographical questions before inquiring about his relationship with TM and the reason that she had obtained a restraining order that excluded him from the apartment that they had previously shared. Defendant acknowledged that he had a volatile relationship with TM but denied that he had ever hit her. Defendant stated that, despite the restraining order, TM had invited him to the apartment nearly every day.

Michaels then asked defendant about the events of the day and night leading up to the fire. Defendant said that he and TM had gone to a bar, they had an argument, and he had driven her home around 1:30 a.m. Defendant claimed that he left the apartment at about 2:00 a.m. and spent the rest of the night hanging out with his cousin Larry. Defendant stated that he had learned about the fire when a neighbor called him between 4:00 a.m. and 5 a.m. He suggested that TM or one of her roommates could have started the fire.

Michaels then suggested that they take a break and offered to get defendant water or anything else he needed. When she returned to the interview room, Micheals told defendant that she had looked at TM's phone and could tell from his calls and text messages that he had remained in

the apartment until about 3:20 a.m., and that a neighbor's security camera had shown him leaving the apartment when the fire started. Michaels then asked defendant to tell her what "really happened," stating that she knew that defendant had threatened to soak TM's couch in gasoline. Defendant responded by stating that he did not remember starting the fire.

Michaels then told defendant that it would "ease" his pain if he took responsibility and that this was his opportunity to help TM and the victims' families. She indicated that people often feel better when "they own up to stuff." Defendant responded that TM had started the fire. Michaels said that TM "wasn't there" and that they had "pinged" her phone and knew that she was not at the apartment when the fire started. Michaels asked defendant what "made him do this," and defendant responded that nothing would make him do this. He then asked for some water.

Michaels left the interrogation room, returning with a glass of water for defendant. Michaels then outlined some of the evidence showing that defendant had started the fire and told him that the victims' families deserved to know what had happened. Defendant began to cry and stated that he was trying to remember what had happened.

At that point, Michaels suggested that they take a break and told defendant that she had to fill out some paperwork. She stated that this would give defendant a chance to "think a little bit" about what he wanted to say, considering the evidence showing that he had started the fire. Luiz then interjected and said that the evidence would show what had happened, and that "everybody" was going to see whether defendant was being honest or dishonest. Luiz told defendant that this was "his opportunity to be honest"; that a judge, jury, prosecutor, and the victims' families would know if he was being honest; and that no one would believe him if he said he did not remember starting the fire.

Michaels then told defendant that the detectives were going to "fill out paperwork" and that it was going to "take a little while." She told defendant that, if he wanted to talk to them while they filled out the paperwork, he could

let them know. She told defendant to think more about his "story" and told him that, regardless, he was going to jail "on charges related to this." Defendant asked, "What's going to happen today?" Michaels responded that, after she filled out the paperwork, he would be booked into jail. She told defendant that this was his "opportunity" to tell them what had happened, and that she wanted him to "sit for a while." The detectives and defendant then left the interrogation room.

About 15 minutes later, defendant and the detectives returned to the interrogation room. Michaels had papers in her hands and told defendant that she was filling out a custody report with his biographical information and information about the charges. She did not tell him what those charges were. Luiz then asked defendant if he had thought about this while he was in his cell and stated:

> "Here it is. Right? We are filling out the paperwork, bro. This is it. This is it. The last time that we are going to talk. The last time you have an opportunity to tell us what happened. * * * Once we are done here, you are going to jail. And we are not going to be able to talk any more. You have this opportunity. This one right here."

Luiz tapped his finger on the table as he made those comments.

Defendant then asked if he could call his kids' mom. Michaels responded that they could "arrange that in a little bit." Defendant then stated that there was "something wrong with him," that he did not want to waste their time, and that he was sorry, but he did not do it.

At that point in the interrogation, Michaels told defendant that they knew what had happened, and that he was facing charges of arson and "agg murder." She asked defendant if he knew what "agg murder" was. Defendant responded that he did not, and Michaels said that "agg murder happens when you intentionally do things like this." She told defendant that they had not told him about all the evidence that they had, but that they had told him the parts that he needed to know so that he could understand that "we know it's you." Michaels then stated that there was

evidence that accelerant was used not only on the couch, but also "going up the stairs," and that showed "intentionality."

Michaels then asked defendant, "Did you intentionally do something so that [the roommates] couldn't get out?" She told defendant, "[T]hat's what we are looking at right now." Michaels stated that defendant "seemed surprised" by her statement that accelerant had been found on the stairs, and she asked him why. Defendant responded that he "just thought it was poured all over the couch." Michaels asked why he thought that. Defendant responded that he had learned from his sister that the couch was where the fire had started. Michaels then said, "I think you know because that's where you started it. And you would know that it wasn't up the stairs."

Michaels then stated that she was "trying to figure out" whether defendant had started the fire intending to kill the roommates, or whether he had started the fire "to give [TM] a message." She stated that there were "different aspects" to each of those scenarios, and that they carried "different amounts of * * *." She did not finish the sentence; defendant interrupted and said, "I know." Michaels then said that they knew that defendant was in the apartment and that they were asking questions to learn his "motivation."

Defendant then responded that he did not want to hurt anyone. Michaels asked, "then what did happen, Ryan?" Defendant paused, and then asked again if he could call his kids' mom. Michaels said that he could call her as soon as they were "done here," and stated that "I need you to talk to me first, please." Defendant paused and said, "Let me try to figure it out." Michaels responded, "Okay." Defendant then stated, "I didn't mean for any of this to happen." Michaels responded, "I believe that." Defendant asked whether he was going to "go away for life for this." Michaels responded that "different amounts of time" go with "different things" and that she would not know the answer until she heard the "full story."

At that point, defendant asked if he could talk to Michaels alone. Luiz left the room. Defendant then told Michaels that he had poured gasoline on TM's couch, but

that he did not pour any on the stairs or intend to start the fire. He said that he did not remember lighting the gasoline and stated that the fumes must have accidentally ignited when he tried to light a cigarette. Michaels told defendant that that was not possible. As the interrogation concluded, defendant continued to claim that he did not intentionally light the couch on fire.

C.   *Trial Court Proceedings*

Defendant was indicted and charged with numerous crimes relating to the fire, including two counts of second-degree murder based on felony murder. He filed a demurrer to the felony-murder counts, contending that the felony-murder statute, ORS 163.115(1)(b), violated his federal right to due process. Specifically, defendant contended that the statute required a factfinder to conclusively presume a culpable mental state as to the causation of death, and that such a presumption violated the Due Process Clause. Alternatively, defendant contended that Oregon's felony-murder statute created a strict liability offense that violated due process by dispensing with a culpable mental state regarding causation of death. The trial court denied the demurrer.

Defendant also filed a pretrial motion to suppress the statements that he had made to Michaels and Luiz during the interrogation, contending that his statements were not voluntary. Michaels testified at the hearing on the motion to suppress, and a video of the interrogation was shown to the court. The trial court denied the motion to suppress, concluding that defendant's statements were voluntary. The trial court made factual findings regarding defendant's condition at the time of the interrogation, the nature of the interrogation, and Michaels's demeanor at the time.

Specifically, the trial court found that defendant was "struggling" and "upset" at times during the interview, but that he showed no signs of intoxication; the hospital had found nothing physically wrong with him; defendant had the opportunity to sleep the night before the interrogation; and he did not appear to be suffering psychologically more than expected when being interrogated about a fire where two people had died. The court also found that Michaels was

calm, patient, and empathetic throughout the interrogation, and that she had never "really turned up the heat at all." In addition, the court noted that the detectives had accommodated defendant's requests for breaks or water, and that the fact that defendant had asked to speak to Michaels alone demonstrated to the trial court that he was comfortable speaking with her.

The case proceeded to trial, and defendant was convicted of numerous counts, including the two felony-murder counts. Defendant appealed, and the Court of Appeals affirmed the convictions, concluding that the trial court did not err in denying defendant's motion to suppress and in denying the demurrer to the felony-murder counts. *Monaco*, 336 Or App at 686. We allowed review on both issues.

## II. DISCUSSION

As noted above, we review the denial of defendant's motion to suppress for legal error, and we also review the denial of his demurrer to the two felony-murder counts for legal error. *See State v. Fanus*, 336 Or 63, 67-74, 79 P3d 847 (2003) (applying principle in affirming denial of demurrer challenging constitutionality of aggravated murder sentencing statutes). We begin with the motion to suppress.

A.  *Motion to Suppress Defendant's Statements*

Defendant contends that the statements he made were not voluntary, requiring their suppression under ORS 136.425; Article I, section 12, of the Oregon Constitution; and the Fifth and Fourteenth Amendments to the United States Constitution. Applying our traditional approach, we first address defendant's arguments under the Oregon statute and constitution before addressing the federal constitutional claim. *See State v. Babson*, 355 Or 383, 432-33, 326 P3d 559 (2014) (describing the "first things first" approach).

ORS 136.425(1) provides that "[a] confession or admission of a defendant, whether in the course of judicial proceedings or otherwise, cannot be given in evidence against the defendant when it was made under the influence of fear or produced by threats." The purpose of the statute is "to exclude potentially false—and thus unreliable—confessions

from evidence." *State v. Powell*, 352 Or 210, 222, 282 P3d 845 (2012). Article I, section 12, of the Oregon Constitution, provides in, part, that "[n]o person shall * * * be compelled in any criminal prosecution to testify against himself." The purpose of the constitutional provision is "[t]o protect a person's right against compelled self-incrimination." *State v. Roble-Baker*, 340 Or 631, 638, 136 P3d 22 (2006).

In addition to serving different purposes, we have determined that, unlike the constitutional provision, the statute is not limited "to confessions induced by and made to state actors." *Powell*, 352 Or at 222-23. That distinction between the statute and Article I, section 12, makes no difference in this case, and this court has recognized that both provisions "embody the common-law rule that confessions made by a defendant in custody that were 'induced by the influence of hope or fear, applied by a public officer having the prisoner in his charge,' are inadmissible against the defendant." *Jackson*, 364 Or at 21 (quoting *Powell*, 352 Or at 218).

The state has the burden of proving, by a preponderance of the evidence, that a confession was voluntary. *Powell*, 352 Or at 225-26. The voluntariness of an admission or confession "depends on whether or not, in the totality of the circumstances, a defendant's free will was overborne and his or her capacity for self-determination was critically impaired." *Jackson*, 364 Or at 21. Giving *Miranda*-type warnings at the outset of an interrogation is a relevant factor, but it "is not a guarantee that statements made after the warnings are voluntary." *Id.*

Defendant contends that the trial court erred in concluding that the state met its burden here, because the detectives "conveyed an implied promise of leniency" by suggesting that defendant would be less culpable and would receive more lenient treatment if he confessed to starting the fire without intending to kill anyone. Defendant contends that, like the detectives in *Jackson*, the detectives in this case employed an interrogation method that is generally known as the "Reid technique." *See Jackson*, 364 Or at 28-29 (describing the "Reid technique" as a method that "involves isolating a suspect in a small room to increase

anxiety; confronting the suspect with accusations of guilt and emphasizing the strength of the evidence against the suspect; offering sympathy and justifications or rationalizations to allow the suspect to minimize the crime; and encouraging the suspect to see confession as a means of terminating the interview" (citing S. Kassin *et al*, *Police Induced Confessions: Risk Factors and Recommendations*, 34 Law & Hum Behav 3, 6 (2010))).

According to defendant, the detectives in this case, following the "Reid technique," employed "maximization tactics" by confronting defendant with evidence that tended to show that he intentionally killed the upstairs roommates by setting fire to the couch and staircase, followed by "minimization tactics" by implying that defendant would receive the benefit of lesser charges if he confessed to starting the fire without intending to kill anyone. We agree that the detectives appear to have generally utilized the "Reid technique" and employed maximization and minimization tactics during the interrogation. However, *Jackson* expressly rejected the defendant's suggestion "that the use of the Reid technique or other strategies to obtain information from a suspect is necessarily coercive or will always require the exclusion of inculpatory statements." 364 Or at 31. Rather, the question a trial court must decide "is not whether a particular interrogation method was used, but whether, considering the totality of the circumstances, the suspect's will was overborne." *Id.*

Our analysis of that issue in *Jackson* is instructive. There, we observed that this court "has long recognized" that confessions made because of impermissible inducements consisting of "suggestions of leniency" are not reliable. *Id.* at 22. That is because confessions "'rendered under circumstances in which the confessor perceives that he or she may receive some benefit or avoid some detriment by confessing, regardless of the truth or falsity of the confession,'" are unreliable. *Id.* at 23 (quoting *Powell*, 352 Or at 222). On the other hand, our cases have drawn "a distinction between permissible 'mere adjuration' and 'adjuration accompanied by inducement.'" *Id.* at 24 (quoting *State v. Linn*, 179 Or 499, 510, 173 P2d 305 (1946)). A permissible "mere adjuration"

occurs, for example, "where defendants [have] been told, as a general matter, that it would be better if they told the truth, or that they would feel better if they told the truth[.]" *Id.* By contrast, an impermissible inducement "is one that conveys to a defendant the idea of a threat or promise." *Id.*

Applying those principles in *Jackson*, we concluded that the detectives' statements in that case that involved two basic themes—relieving the defendant's conscience and easing the suffering of the victims' families—were generally permissible as "mere adjurations." *Id.* at 25. But we further concluded that statements "concerning the legal ramifications of [the] defendant's failure to confess" and statements "about how the interrogation itself would proceed" were potentially coercive. *Id.*

In the first category of potentially coercive statements, we noted that the detectives' statements in *Jackson* moved "from the fairly benign to the more legally significant." *Id.* The "fairly benign" statements included those suggesting that it "would *** [be] best for everybody" if the defendant confessed and that they were trying to "help" the defendant by encouraging him to confess. *Id.* But other statements regarding the consequences of a failure to confess were more legally significant. That included statements implying that the defendant might become a suspect in other murders if he did not confess; that the jury would hear "irrefutable" evidence of the defendant's guilt and would "react badly" if he did not confess; that the detectives, the victims' families, and the jury would view the defendant as a "monster" if he did not confess; and that the detectives would do everything they could to ensure that he received a harsh sentence. *Id.*

In the second potentially coercive category—statements about how the interrogation itself would proceed—the detectives in *Jackson* had stated that they were giving the defendant "his only significant chance to confess" because anything he said later would sound as though he were "cooking a story." *Id.* In addition, the detectives said that they were prepared to continue the interrogation "all day" and into a second day, if necessary; that they were "working together" with defendant; and that "he would not be permitted to talk

to his family" until they had "worked through" these issues. *Id.* at 25-26. Taken together, we viewed those statements as "potentially problematic" because they "conveyed to [the] defendant that he 'may receive some benefit or avoid some detriment by confessing, regardless of the truth or falsity of the confession.'" *Id.* at 27 (quoting *Powell*, 352 Or at 222).

We ultimately agreed with the trial court that *Jackson* was "a close case." *Id.* at 31. On the one hand, the detectives "were skilled, and they may have succeeded in convincing [the] defendant to voluntarily tell them what happened, to the best of his memory." *Id.* at 31-32. In that regard, we noted that the detectives "did not make any promise of immunity" and had explained that the defendant would be charged with murder no matter what he said. *Id.* at 32. In addition, they had informed the defendant of his right to remain silent and to consult with counsel; they had permitted the defendant to take breaks upon request and were not consistently "hostile"; and "[f]or the most part," the detectives "appealed to [the] defendant's better nature and encouraged him to help the families of the victims." *Id.*

On the other hand, we noted that the defendant in *Jackson* had been diagnosed with schizophrenia; that he had experienced delusions in the past; that he took medication for depression; and that he had significant memory problems and physical disabilities. *Id.* In addition, the detectives had isolated the defendant; did not allow him to call his family until they had "worked through" things; and continued to question him for a significant length of time. *Id.* The detectives also told him that it would be best for him to confess because that might eliminate him as a suspect in additional crimes and would give him more control over how the case would proceed; they also said that they would do their best to ensure that he received the maximum possible sentence if he did not confess. *Id.* We indicated that none of those factors, "[v]iewed independently," would be dispositive, but "together they indicate that the detectives' methods and inducements may have persuaded [the] defendant to tell the detectives what they wanted to hear, whether or not that was the truth." *Id.* Ultimately, considering the totality of the circumstances, we agreed with the trial court that the state

had not met its burden of establishing that the defendant's admissions were voluntary. *Id.*

Applying those principles here, we note that the interrogation that detectives Michaels and Luiz conducted is similar in some ways to the interrogation that the detectives conducted in *Jackson*. The detectives here informed defendant of his right to remain silent and to consult with counsel; they did not make any express promise of leniency; and they were not overtly hostile during the interrogation. Michaels was calm, patient, and empathetic during the interrogation, as the trial court found. For the most part, the detectives appealed to defendant's conscience and the effect his confession would have on the victims' families. They told defendant that he was going to jail on charges related to the fire regardless of what he said. On the other hand, the detectives indicated that defendant was potentially facing aggravated murder charges, that it would be better *for defendant* if he confessed, and that the judge and jury "would know" if he had told the truth. In addition, they conveyed to defendant a sense of urgency, telling him that this was his "opportunity" to tell the truth, and that he needed to do so before they finished filling out the paperwork on his case. Luiz became more insistent toward the end of the interrogation. And the detectives declined to allow defendant to call his children's mother until they finished the interrogation.

As in *Jackson*, none of those factors, in isolation, is dispositive. We hold that the trial court did not err in concluding, under the totality of the circumstances, that defendant's statements were voluntary. Although the interrogation here was like the interrogation in *Jackson* in some respects, it was different enough to support a different conclusion.

Unlike the interrogation in *Jackson*, the detectives here did not state that defendant would be considered a suspect in other crimes if he did not confess. The interrogation took place after defendant had an opportunity for a full night's rest; he showed no signs of intoxication or impairment; the interrogation lasted four hours and was conducted in the middle of the day; and the detectives did not threaten to keep interrogating defendant "all day" and into

a second day, as the detectives in *Jackson* had threatened. And although defendant had required medical attention the night before the interrogation and stated at one point that "something" was wrong with him, unlike the defendant in *Jackson*, defendant does not have a history of significant mental illness, memory problems, and physical disabilities. Finally, defendant was comfortable speaking to Michaels alone and maintained at the end of the interrogation that he did not remember starting the fire, indicating that he did not just tell the detectives what they wanted to hear. All things considered, we conclude that the trial court did not err in determining that the preponderance of the evidence supports the conclusion that defendant's statements during the interrogation were voluntary, and that his will was not overborne by any implied threats or promises of leniency.

We reach the same conclusion on defendant's contention that his statements should have been suppressed under the Fifth and Fourteenth Amendments to the United States Constitution. As under the Oregon Constitution, the state must prove voluntariness by a preponderance of the evidence. *Lego v. Twomey*, 404 US 477, 489, 92 S Ct 619, 30 L Ed 2d 618 (1972). Under the United States Constitution, we must examine the totality of the circumstances to determine whether a confession was made "freely, voluntarily, and without compulsion or inducement of any sort." *Haynes v. Washington*, 373 US 503, 513, 83 S Ct 1336, 10 L Ed 513 (1963) (citation and internal quotation marks omitted). For the reasons stated above in connection with our state constitutional analysis, we conclude that the trial court did not err in declining to suppress defendant's statements under the United States Constitution.

B.   *Due Process Challenge to Felony-Murder Convictions*

As stated, defendant contends that the application of the felony-murder statute, ORS 163.115(1)(b), in this case violates the Due Process Clause. Specifically, defendant contends that the statute either required a factfinder to conclusively presume that defendant acted with a culpable mental state as to causing death or creates a strict liability offense for felony murder. In either case, according to defendant, the statute violates the Due Process Clause. *See* Nelson E. Roth

& Scott E. Sundby, *The Felony-Murder Rule: A Doctrine at Constitutional Crossroads*, 70 Cornell L Rev 446, 449 (1985) (suggesting that courts must either characterize the felony-murder rule as a conclusive presumption or as a strict liability offense and contending that the rule violates due process either way).

Defendant first contends that ORS 163.115(1)(b) gives rise to a conclusive presumption and that such a presumption violates due process under *Sandstrom v. Montana*, 442 US 510, 99 S Ct 2450, 61 L Ed 2d 39 (1979). The defendant in *Sandstrom* was convicted of deliberate homicide for "purposely or knowingly" causing the death of the victim. 442 US at 512. The defendant admitted killing the victim, but he contended that he did not do so "purposely or knowingly." *Id.* The issue before the United States Supreme Court was whether instructing the jury that the law "presumes that a person intends the ordinary consequences of his voluntary acts" violated the Fourteenth Amendment's requirement that the state must prove every element of a criminal offense beyond a reasonable doubt. *Id.* at 513. The Court held that the instruction violated the defendant's right to due process. *Id.* at 525. The problem with such an instruction, the Court explained, was that the jury "could reasonably have concluded that they were directed to find against [the] defendant on the element of intent." *Id.* at 523. As a result, the state was not required to prove beyond a reasonable doubt "every fact necessary to constitute the crime" charged. *Id.* Thus, the Supreme Court held that the jury may have interpreted the instruction "as constituting either a burden-shifting presumption[,] *** or a conclusive presumption[,]" and that "either interpretation would have deprived [the] defendant of his right to the due process of law[.]" *Id.* at 524.

Under *Sandstrom*, a statute that results in a burden-shifting or conclusive presumption as to a material element of the offense violates due process. Defendant contends that ORS 163.115(1)(b) is such a statute, because it gives rise to a conclusive presumption of a culpable mental state as to causing death. According to defendant, Oregon's felony-murder statute gives rise to that conclusive presumption,

because (1) felony murder is criminal homicide under Oregon law; (2) ORS 163.005(1) defines "criminal homicide" as "intentionally, knowingly, recklessly or with criminal negligence caus[ing] the death of another human being"; and (3) this court concluded in *Blair*, 348 Or 72, that felony murder in Oregon does not require proof of a separate culpable mental state as to causing death despite ORS 163.005(1).

We agree that, under *Blair*, felony murder does not require proof of a separate culpable mental state as to causing death, notwithstanding ORS 163.005(1). But that does not mean that a separate culpable mental state as to causing death is a required element of felony murder that is *conclusively presumed* in Oregon. Instead, as *Blair* concludes, the only culpable mental state required for felony murder in Oregon is established as a matter of law when the state proves the culpable mental state required for the predicate felony. Because there is no separate culpable mental state required for causing death on a felony-murder charge, the law does not conclusively presume any element that the state is required to prove.

The state charged the defendant in *Blair* with felony murder and other crimes. 348 Or at 74. Before trial, the defendant demurred to the felony-murder charge, contending that, "because felony murder is a form of criminal homicide, the state was required to allege in the indictment one of the mental states described in ORS 163.005(1)[.]" *Id.* at 74. The trial court overruled the demurrer. *Id.* at 74-75. At trial, the defendant requested jury instructions that would have required the state to prove that he "had caused the victim's death knowingly, recklessly, or with criminal negligence as one of the elements of felony murder." *Id.* at 75. The trial court refused to give those instructions, and a jury convicted the defendant of felony murder. *Id.* The Court of Appeals affirmed that conviction. *Id.* We allowed review to determine whether the definition of criminal homicide in ORS 163.005(1) applies to felony murder, as codified in ORS 163.115(1)(b), "in such a way that felony murder in Oregon requires the state to allege and prove that a defendant acted with a mental state in causing the victim's death distinct

from any mental state required to prove the underlying felony." *Id.* at 75.

In resolving that question, we first noted that, before the Criminal Code revisions in 1971, this court had "consistently incorporated an 'implied malice' rule into felony murder, that is, felony murder contains no distinct or independent *mens rea* requirement in relation to the cause of death of the victim." *Id.* at 78 (citing *State of Oregon v. Brown*, 7 Or 186, 198, 204 (1879); *State v. Branch*, 244 Or 97, 100, 415 P2d 766 (1966); *State v. Dorland*, 161 Or 403, 404, 89 P2d 595 (1939)). Thus, when the legislature adopted ORS 163.005 and ORS 163.115 in 1971,

> "the felony murder rule, as construed and applied by this court, long had operated to impose responsibility for homicides that occur during the commission or attempted commission of a felony, *without* the separate and additional requirement that the defendant acted with a *mens rea* in causing the death of another person."

*Id.* (emphasis added). And we further noted that this court, in cases decided after those statutes were adopted in 1971, had "continued to treat felony murder as requiring no distinct or independent *mens rea* with respect to the cause of the victim's death." *Id.* (citing *State v. Link*, 346 Or 187, 205, 208 P3d 936 (2009); *State v. Zweigart*, 344 Or 619, 626, 188 P3d 242 (2008), *cert den*, 558 US 829 (2009); *State v. Quinn*, 290 Or 383, 405 n 8, 623 P2d 630 (1981), *overruled on other grounds by State v. Hall*, 339 Or 7, 115 P3d 908 (2005)). We saw nothing in the statutes to indicate "that the legislature intended to change that long-standing rule." *Id.* at 79. And we noted that "much [of] the legislative history suggests that the legislature intended to adhere to it." *Id.* at 80.

In summary, we determined in *Blair* that the text, context—including this court's case law—and the legislative history of the felony-murder statutes "compel the conclusion that the legislature intended to continue the implied malice rule." *Id.* And as we noted in *Blair*, that "implied malice rule" does not require a "distinct or independent *mens rea* requirement in relation to the cause of death of the victim." *Id.* at 78. Accordingly, we concluded without further explanation that

> "(1) under ORS 163.005(1), 'criminal homicide' requires that a defendant act with a culpable *mens rea* with respect to causing the victim's death; (2) under ORS 163.005(2), 'criminal homicide' includes 'murder,' and (3) under ORS 163.115(1)(b), requisite culpable *mens rea is established, as a matter of law, by the defendant's commission or attempted commission of the predicate felony.*"

*Id.* at 80 (emphasis added).[1] Thus, the trial court "properly overruled [the] defendant's demurrer and properly refused to give [the] defendant's requested jury instruction." *Id.*

Defendant does not contend that *Blair* was wrongly decided, nor are we otherwise persuaded at this time to revisit that opinion, so we adhere to its holding.[2] We did not conclude in *Blair* that a culpable mental state as to causing death was *conclusively presumed* for felony murder. Rather, we concluded that a separate culpable mental state as to causing death was not required, and that the only culpable mental state required for felony murder could be established by proof that the defendant committed the predicate felony with its requisite mental state.[3] And as we will explain, we

---

[1] In concluding that a *separate* culpable mental state with respect to causing the victim's death was not required for felony murder in Oregon, the *Blair* court acknowledged that ORS 163.005(1) required a culpable mental state with respect to causing the victim's death for "criminal homicide," including "murder." The court's reading of that statute in conjunction with ORS 163.115(1)(b) meant that any required culpable mental state for causing death was established as a matter of law by proof of the culpable mental state for the predicate felony, and that a *separate* culpable mental state as to causing death was not required. The concurring opinion disagrees, stating that "the most sensible way" to read *Blair*'s conclusion is that the term "culpable *mens rea*" in point (3) refers to ORS 163.005(1) and (2), not to the statute that immediately precedes that phrase, ORS 163.115(1)(b). 375 Or at 30 (DeHoog, J., concurring). Although the *Blair* opinion states its conclusion without further explanation, as noted, the concurrence's reading of that conclusion cannot be "the most sensible way" to read it, because that reading violates the doctrine of the last antecedent, a "long-recognized grammatical principle" ordinarily used in interpreting statutes. *State v. Webb*, 324 Or 380, 386, 927 P2d 79 (1996). Under that principle, "[r]eferential and qualifying words and phrases, where no contrary intention appears, refer solely to the last antecedent." *Id.* (citation and internal quotation marks omitted). Thus, a phrase "usually is construed to apply to the provision or clause immediately preceding it." *Id.*

[2] Because there was no due process issue asserted in *Blair*, the court did not address whether its reading of the felony-murder statutes effectively resulted in a conclusive presumption for purposes of the Due Process Clause.

[3] The concurring opinion states that a culpable mental state as to causing death *is* an element of felony murder, but that it is an element that the state is not required to prove. 375 Or at 38 (DeHoog, J., concurring). Our Criminal Code defines crimes in terms of the elements that the state must prove at trial. The Uniform Criminal Jury

conclude in this case that Oregon's felony-murder statute, as interpreted in *Blair*, does not violate due process.

*Sandstrom* is not to the contrary, and no other United States Supreme Court case has addressed the issue.[4] The defendant in *Sandstrom* was charged with deliberate homicide, not felony murder, so the United States Supreme Court did not decide in that case whether a state's felony-murder statute constituted a burden-shifting or conclusive presumption that violated due process. But the highest courts in other states have addressed the issue. Those courts have consistently determined that state felony-murder statutes that, like Oregon's law, do not require proof of a separate culpable mental state as to causing death, do not result in a conclusive presumption that violates due process.

For example, in *State v. Patterson*, 311 Kan 59, 61-62, 455 P3d 792, 795 (2020), the defendant contended that his felony-murder conviction violated due process because Kansas law "requires an intent-to-kill element for homicide" that is eliminated for felony murder because "that intent is conclusively presumed based only on the jury's finding [that] the defendant was participating in an inherently dangerous

---

Instructions are all written in terms of the elements that the state must prove for each offense. *See, e.g.*, UCrJI 1305 (listing the elements that "the state must prove beyond a reasonable doubt" to establish the crime of second-degree felony murder). The concurring opinion does not explain how something can be a required element of an offense if the state is not required to prove it.

[4] The state contends that felony-murder statutes are "beyond constitutional challenge" under *Lockett v. Ohio*, 438 US 586, 98 S Ct 2954, 57 L Ed 2d 973 (1978). We disagree. The defendant in *Lockett* drove the getaway car in a robbery-murder. 438 US at 590-51. She was convicted of aggravated murder and sentenced to death. *Id.* at 597. The main issue before the Supreme Court was the constitutionality of the death sentence, but the Court also addressed—albeit briefly—a due process challenge to her conviction. The defendant contended that the Ohio Supreme Court's interpretation of the "complicity provision" of Ohio's aggravated murder statute "was so unexpected that it deprived her of fair warning of the crime with which she was charged" in violation of the Due Process Clause. *Id.* The Supreme Court disagreed, concluding that the Ohio Supreme Court's opinion "shows clearly" that the construction given the statute was consistent with prior Ohio law and the statute's legislative history. *Id.*

The Court then stated, in the context of addressing the defendant's constitutional challenge to the death sentence, that "States have authority to make aiders and abettors equally responsible, *** *or to enact felony-murder statutes*" and that such a proposition "is beyond constitutional challenge." *Id.* at 602 (emphasis added). That statement was in a section of the opinion that was joined by only four justices, and it did not amount to a holding that state felony-murder statutes are beyond constitutional challenge. *Id.* at 589, 602.

felony." The Kansas Supreme Court disagreed, holding that the Kansas felony-murder statute "does not operate as an unconstitutional, conclusive presumption that invades the jury's province." *Id.* at 67, 455 P3d at 798. The court explained that, under Kansas law, "intent to kill is not an element of felony murder" and that the statute "expressly requires proof that the defendant engaged in dangerous, felonious conduct and that a death occurred as a result of that conduct." *Id.* at 67, 455 P3d at 798.[5] The court concluded that, "[b]y codifying participation in the felony as a statutory alternative for the intent and premeditation otherwise required for a first-degree murder conviction, the statute imposes a rule of law. It does not remove from the jury's consideration an intent element required by a criminal statute." *Id.*

In *State v. Burkhart*, 325 Mont 27, 103 P3d 1037 (2004), the Montana Supreme Court distinguished the transfer of felonious intent under Montana's felony-murder statute from the type of conclusive presumption that the Supreme Court disapproved in *Sandstrom*. The court first noted that, under the Montana statute, the defendant's "purpose and knowledge to commit felony-murder was presumed when he assaulted [the victim] *** causing [the victim's] death." 325 Mont at 40-41, 103 P3d at 1046.[6] But, the court explained, such a presumption "is not analogous to that derided in

---

[5] The Kansas felony-murder statute addressed in *Patterson* provided that "[m]urder in the first degree is the killing of a human being committed: (1) intentionally, and with premeditation; or (2) in the commission of, attempt to commit, or flight from any inherently dangerous felony." Kan Stat Ann § 21-5402(a). The Kansas statute does not include a definitional provision for "murder" or "homicide" that imports a general term like "criminal homicide" into its definition of murder comparable to ORS 163.005(1). The *Patterson* court noted that the Kansas Supreme Court had "long recognized" that, in felony-murder cases, "'the elements of malice, deliberation, and premeditation which are required for murder in the first degree are deemed to be supplied by felonious conduct alone if a homicide results.'" 311 Kan at 63, 455 P3d at 796 (quoting *State v. Hobbs*, 248 Kan 342, 345-46, 807 P2d 120, 124 (1991), *overruled on other grounds by State v. Berry*, 292 Kan 493, 254 P3d 1276 (2011)).

[6] The Montana felony-murder statute addressed in *Burkhart* provided that a person "commits the offense of deliberate homicide" if the person

"attempts to commit, commits, or is legally accountable for the attempt or commission of *** assault with a weapon *** or any other forcible felony and in the course of the forcible felony or flight thereafter, the person or any person legally accountable for the crime causes the death of another human being."

*Sandstrom.*" *Id.* at 42, 103 P3d at 1047. That is because the presumption created by the felony-murder statute "does not operate to shift a burden from the state to the defendant, but rather substitutes proof of the mental state necessary to commit a homicide with proof of the mental state required to commit the underlying felony." *Id.* at 42, 103 P3d at 1047 (brackets omitted). Thus, the court concluded, "because the felony-murder rule does not in fact raise a presumption of the existence of an element of the crime, it does not violate the [D]ue [P]rocess [C]lause." *Id.* at 42, 103 P3d at 1047.

In *State v. Wanrow*, 91 Wash 2d 301, 588 P2d 1320 (1978), *superseded by statute*, 1975 Wash Sess Laws 863, *as recognized in In re Personal Restraint of Andress*, 147 Wash 2d 602, 56 P3d 981 (2002), the Washington Supreme Court addressed a due process challenge to the prior version of Washington's felony-murder statute.[7] The court noted that, under the Washington statute, where a willful assault resulted in death, a prosecutor can allege and prove felony murder "and not have to show intent to kill." 91 Wash 2d at 307, 588 P2d at 1323. The defendant argued that the felony-murder statute violates due process because it "conclusively presumes the existence of an intent to kill from the existence of the malicious felonious intent," thereby shifting the burden to the defendant "to prove the lack of intent to kill[.]" *Id.* at 311, 588 P2d at 1325. The Washington Supreme Court disagreed, explaining that "intent to kill is not an element of second-degree felony-murder" under Washington law. *Id.* Instead, "[t]he intent necessary to prove the felony-murder is the intent necessary to prove the underlying felony." *Id.* The court agreed with other state and federal courts that had "rejected the argument that the felony-murder rule presumes the existence of an intent to kill, or any other intent necessary for the crime of murder,

Mont Code Ann § 45-5-102(1)(b). In addition to felony murder, a person could commit "deliberate homicide" under the Montana statute by "purposely or knowingly caus[ing] the death of another human being." *Id.* § 45-5-102(1)(a).

   [7] Like the Montana statute addressed in *Burkhart*, the Washington statute addressed in *Wanrow* provided that the killing of a human being, unless it is excusable or justifiable, is murder in the second degree when it is "(1) [c]ommitted with a design to effect the death of the person killed or of another, but without premeditation; or (2) [w]hen perpetrated by a person engaged in the commission of, or in an attempt to commit, or in withdrawing from the scene of, a felony[.]" *Former* Wash Rev Code § 9.48.040 (1974), *repealed by* 1975 Wash Sess Laws 863).

in violation of the [D]ue [P]rocess [C]lause." *Id.* (collecting cases).

Every other court to address the issue has reached the same conclusion. *See, e.g., Mares v. State*, 939 P2d 724, 730-31 (Wyo 1997); *State v. Herrera*, 176 Ariz 21, 30-31, 859 P2d 131, 140-41 (1993); *Commonwealth v. Rawls*, 328 Pa Super 469, 473-74, 477 A2d 540, 543 (1984); *People v. Dillon*, 34 Cal 3d 441, 450, 668 P2d 697, 700, 194 Cal Rptr 390, 393 (1983), *superseded by statute*, 2018 Cal Stat ch 1015, *as recognized in*, *People v. Sifuentes*, 83 Cal App 5th 217, 290 Cal Rptr 3d 320 (2022); *Brown v. State*, 448 NE2d 10, 15 (Ind 1983); *State v. Oliver*, 341 NW2d 744, 747-48 (Iowa 1983); *Commonwealth v. Moran*, 387 Mass 644, 649-50, 442 NE2d 399, 402-03 (1982); *State ex rel. Peacher v. Sencindiver*, 160 W Va 314, 316-17, 233 SE2d 425, 426-27 (1977); *State v. Swift*, 290 NC 383, 407-08, 226 SE2d 652, 668-69 (1976); *Gore v. Leeke*, 261 SC 308, 315-16, 199 SE2d 755, 757-58 (1973).[8] Defendant cites no authority holding otherwise.

Oregon's felony-murder statute, as we interpreted it in *Blair*, is comparable to the statutes that were upheld in *Patterson*, *Burkhart*, *Wanrow*, and other cases, in that none of those statutes required a separate culpable mental state as to causing death as an element of felony murder. Rather, the culpable mental state for the underlying felony is the only required culpable mental state under the felony-murder statutes in Oregon and other states. The supreme courts in other states have concluded that those statutes do not violate due process. We agree with those decisions.

The culpable mental state required for felony murder under ORS 163.115(1)(b) is not conclusively presumed. The state still must prove, beyond a reasonable doubt, the culpable mental state required for defendant's commission of the underlying offense, in this case, first-degree

---

[8] The Ninth Circuit reached the same conclusion in *People of Territory of Guam v. Root*, 524 F2d 195, 196 (9th Cir 1975) (holding that "[n]othing in the United States Constitution deprives legislatures of the power to impose upon those who kill their victims in the course of inherently dangerous felonies the same sanctions they choose for those who kill their victims after meditation sufficient to satisfy the jurisdiction's definition of first-degree murder").

arson. That required the state to prove that defendant *intentionally* amaged the apartment by starting a fire, ORS 164.325(1)(a), that resulted in the death of two people. Under *Blair*, proof of *that* culpable mental state is enough, as a matter of law, to establish the culpable mental state required for felony murder under ORS 163.115(1)(b).

In other words, like the felony-murder statutes upheld in other states, ORS 163.115(1)(b) *substitutes* proof of the mental state necessary to prove the underlying felony for proof of acting with a culpable mental state in causing death, as is ordinarily required to prove a criminal homicide. That substitution does not conclusively presume an element of the offense or shift the burden of proof as to an element, because acting with a culpable mental state to cause death is not an element of the offense of felony murder in Oregon. Thus, we agree with every other case to squarely address the issue and conclude that Oregon's felony-murder statute does not conclusively presume a material element of the offense in violation of the Due Process Clause.

As noted, defendant contends that, if ORS 163.115 (1)(b) does not give rise to an impermissible conclusive presumption, then dispensing with proof that defendant acted with a culpable mental state in causing the death of TM's roommates makes felony murder under ORS 163.115(1)(b) a strict liability offense that violates the Due Process Clause. The Court of Appeals concluded that, because a felony murder under ORS 163.115(1)(b), as interpreted in *Blair*, did not require the state to allege or prove that defendant acted with a culpable mental state as to causing death, felony murder in Oregon "is a strict liability offense." *Monaco*, 336 Or App at 703.[9] But, the Court of Appeals was "unpersuaded that, by mere virtue of being a strict liability offense, felony murder under ORS 163.115(3) violates federal due process." *Id.* at 705.

---

[9]  The Court of Appeals noted that one of the drafters of the 1971 Oregon Criminal Code had described the new felony-murder statute as creating "strict liability" for death caused in the commission of a qualifying felony. *Monaco*, 336 Or App at 703 n 2 (citing Tape Recording, Criminal Law Revision Commission, Subcommittee No. 2, Nov 14, 1969, Tape 87, Side 1 (statement of Professor George M. Platt, University of Oregon School of Law)); *see also* Model Penal Code § 210.2 cmt 6 (ALI, Commentaries 1985) (stating that the "classic formulation" of the felony-murder rule "operated to impose liability for murder based on *** strict liability").

As noted, ORS 163.115(1)(b) dispenses with proof of a culpable mental state as to causing death. In that respect, we could characterize felony murder as a strict liability offense, as the Court of Appeals did, at least in part. But if a strict liability offense is an offense that does not require a culpable mental state at all, then felony murder is not *entirely* a strict liability offense. That is because proof of a culpable mental state—the mental state required for the predicate felony—is still required. In any event, the issue is not whether we label or characterize felony murder as a strict liability offense, but whether the offense *as defined by the statute* violates the Due Process Clause. *See State v. Rainey*, 298 Or 459, 464-65, 693 P2d 635 (1985) (noting that, in the case of presumptions, "it is not the label given *** but the effect upon the burden of proof that is significant"). And, as noted, every case to address a due process challenge to a state's felony-murder statute has concluded that the offense, as defined by statutes that are indistinguishable from Oregon's, does not violate due process. Defendant acknowledges that no case has expressly held that a felony-murder statute violates due process because it results in strict liability, but he contends that the United States Supreme Court and the New Mexico Supreme Court have "suggested" that that might be the case.

Defendant contends that the United States Supreme Court made that suggestion in *Rehaif v. United States*, 588 US 225, 139 S Ct 2191, 204 L Ed 2d 594 (2019); *United States v. United States Gypsum Co.*, 438 US 422, 98 S Ct 2864, 57 L Ed 2d 854 (1978); and *Morrissette v. United States*, 342 US 246, 72 S Ct 240, 96 L Ed 288 (1952). But defendant reads too much into those cases.

In *Rehaif*, the Court held that, to convict a defendant for "knowingly" violating a statute that prohibited certain categories of individuals from possessing a firearm, the government must prove both that the defendant knew that he engaged in the prohibited conduct—possessing a firearm—and that he fell within one of the categories listed in the statute. 588 US at 227. The Court explained that it is "the defendant's *status*, and not his conduct alone, that makes the difference." *Id.* at 232 (emphasis in original).[10]

---

[10]  The defendant's status in *Rehaif* was that he was an alien "illegally or unlawfully in the United States." 588 US at 227 (internal quotation marks omitted). After

"Without knowledge of that status, the defendant may well lack the intent needed to make his behavior wrongful." *Id.*

The Court then noted that it has "sometimes declined to read a scienter requirement into criminal statutes." *Id.* But the Court went on, it has "typically declined to apply the presumption in favor of scienter in cases involving statutory provisions that form part of a 'regulatory' or 'public welfare' program and carry only minor penalties." *Id.* Because the firearms statute at issue carried a potential penalty of 10 years in prison, the Court concluded that "this exception to the presumption in favor of scienter does not apply." *Id.* Thus, the Court declined to apply an exception to that usual presumption as a matter of statutory interpretation, not because such a limitation was required by the Due Process Clause. *See id.*

The issue in *United States Gypsum* that is relevant here was "whether intent is an element of a criminal antitrust offense[.]" 438 US at 426. The Court observed that "an effect on prices, without more, will not support a criminal conviction under the Sherman [Antitrust] Act" and thus held that a "defendant's state of mind or intent is an element of a criminal antitrust offense which must be established by evidence and inferences drawn therefrom and cannot be taken from the trier of fact through reliance on a legal presumption of wrongful intent from proof of an effect on prices." *Id.* at 435. The Court disapproved of a jury instruction that stated otherwise, explaining that it was "unwilling to construe the Sherman Act as mandating a regime of strict-liability criminal offenses." *Id.* at 436. The Court indicated that, "while strict-liability offenses are not unknown to the criminal law and do not invariably offend constitutional requirements," it did not construe the Sherman Act to be such an offense. *Id.* at 437-38.

In reaching that conclusion as a matter of statutory interpretation, the Court indicated that its holding in *Morissette* "can be fairly read as establishing, at least with regard to crimes having their origin in the common law, an

---

learning that defendant had been shooting at a firing range, the government prosecuted him for "possessing firearms as an alien unlawfully in the United States," in violation of federal law. *Id.* at 228.

interpretative presumption that *mens rea* is required." *Id.* at 437.

Thus, *Rehaif, United States Gypsum*, and *Morissette* support the conclusion that *some* culpable mental state would be presumed as a matter of statutory interpretation for crimes that originated in the common law. But the Court did not address *what* culpable mental state would be presumed, nor did it suggest that the culpable mental state that is typically required for felony murder—the culpable mental state for the underlying felony—makes felony murder a strict liability offense that violates the Due Process Clause.

Reading such a suggestion into those cases would be inconsistent with how the United States Supreme Court has generally addressed due process limitations on other state criminal statutes. For example, in *Patterson v. New York*, 432 US 197, 198, 97 S Ct 2319, 53 L Ed 2d 281 (1977), the Court rejected a due process challenge to a New York statute that allocated to a defendant charged with murder the burden of proving that the defendant's conduct was the result of an extreme emotional disturbance. In reaching that conclusion, the Court noted that "preventing and dealing with crime is much more the business of the States than it is of the Federal Government[.]" *Id.* at 201. As a result, the Court stated that it "should not lightly construe the Constitution so as to intrude upon the administration of justice by the individual States." *Id.* Normally, the Court explained, it is within the power of a state "to regulate procedures under which its [criminal] laws are carried out, including the burden of producing evidence and the burden of persuasion[.]" *Id.* (citation and internal quotation marks omitted). Thus, the Court concluded, a state's "decision in this regard is not subject to proscription under the Due Process Clause *unless it offends some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental.*" *Id.* (emphasis added; citation and internal quotation marks omitted).[11]

_____

[11] That does not mean that the Due Process Clause provides no constraints at all on state legislatures. *See State v. Burrow*, 293 Or 691, 708, 653 P2d 226 (1982) (Linde, J., dissenting) (cautioning that *Patterson* "is far from holding that legislatures are wholly free to transfer burdens to prove facts on which a defendant's guilt will actually depend by manipulating 'elements' of the statutory definition of the crime").

Given how firmly entrenched the felony-murder rule is in Oregon and the common law, we cannot conclude that the felony-murder rule is so contrary to a fundamental principle of justice that it must be proscribed by the Due Process Clause in this context. *See Blair*, 348 Or at 77-78 (noting that the felony-murder rule "was first codified in Oregon in 1864" and that the rule "long had operated to impose responsibility for homicides that occur during the commission of a felony, without the separate and additional requirement that the defendant acted with a *mens rea* in causing the death of another person"); *Burkhart*, 325 Mont at 37-38, 103 P3d at 1044 (tracing the common law felony-murder rule to a sixteenth-century case, *Mansell & Herbert's Case*, 2 Dyer 128b; 73 Eng Rep 279 (KB 1558); Roth and Sundby, 70 Cornell L Rev at 449 (noting that some commentators trace the rule to a different sixteenth-century case, while others trace it to "a 'blunder' by Lord Coke," and concluding that the "origins of the felony-murder rule are disputed").[12] Thus, even if we were to characterize Oregon's felony-murder statute as defining a strict liability offense at least in part, that does not mean that the statute violates the Due Process Clause.

That is consistent with our observation that the United States Supreme Court, "in applying the federal constitution, has generally refused to interfere with the historical state power to create strict liability offenses." *State v. Buttrey*, 293 Or 575, 587, 651 P2d 1055 (1982) (citing *Powell v. Texas*, 392 US 514, 536, 88 S Ct 2145, 20 L Ed 1254 (1968) (plurality opinion), and other cases). That is because state legislatures "have always been allowed wide freedom to determine the extent to which moral culpability should be a prerequisite to conviction of a crime." *Powell*, 392 US at 545 (Black, J., concurring).

Defendant points out that the New Mexico Supreme Court construed that state's felony-murder statute to

---

[12] Another commentator described the origins of the common-law felony-murder rule as a "myth," concluding that "Americans did not receive any felony murder rules from England, for the simple reason that there was no common-law felony-murder rule at the time of the American Revolution." Guyora Binder, *The Origins of American Felony Murder Rules*, 57 Stan L Rev 59, 63 (2004). England abolished its felony-murder rule by statute in 1957. Homicide Act 1957, 6 Eliz 2 c 11, § 1 (Gr Brit).

require proof of intent to kill, stating that such a construc-tion "removes the statute from [a] threat of unconstitution-ality." *State v. Ortega*, 112 NM 554, 563, 817 P2d 1196, 1205 (1991), *abrogated on other grounds as recognized by Kersey v. Hatch*, 148 NM 381, 237 P3d 683 (2010). The holding in *Ortega* was that New Mexico's felony-murder statute,

> "requiring as it does both causation attributable to the defendant *** and an intent to kill (or to do an act greatly dangerous to the lives of others or with knowledge that the act creates a strong probability of death or great bodily harm), *is a valid exercise of the legislature's authority to prescribe serious punishment for killings committed with the requisite criminal intent* and that occur during the com-mission or attempted commission of a first degree or other inherently dangerous felony."

112 NM at 566, 817 P2d at 1208 (emphasis added). That interpretation of the New Mexico statute thus avoided a "threat of unconstitutionality," but the New Mexico Supreme Court did not hold that the statute would violate the Due Process Clause without it. *Id.* at 563, 817 P2d at 1205.

In summary, defendant cites no case holding that a state felony-murder statute that is comparable to ORS 163.115(1)(b) violates the Due Process Clause. We agree with the courts in every other state that have addressed the issue: Felony-murder statutes that are indistinguishable from ORS 163.115(1)(b) do not conclusively presume a mate-rial element of the offense or shift the burden of proof to the defendant in violation of a defendant's right to due process. Treating ORS 163.115(1)(b) as imposing strict liability in part does not establish a due process violation in this case.

We acknowledge that the felony-murder rule has been widely criticized by many scholars and jurists. *See* Roth and Sundby, 70 Cornell L Rev at 446 (summarizing the criticisms and noting that "[f]ew legal doctrines have been as maligned and yet have shown as great a resiliency as the felony-murder rule"); Binder, 57 Stan L Rev at 60 (stating that liability for felony murder "is one of the most persistently and widely criticized features of American criminal law"). The felony-murder rule has been criticized for having a disparate racial impact, *see* Perry Moriearty,

Kat Albrecht, & Caitlin Glass, *Race, Racial Bias, and Imputed Liability Murder*, 51 Fordham Urb L J 675 (2024); G. Ben Cohen, Justin D. Levinson, & Koichi Hioki, *Racial Bias, Accomplice Liability, and The Felony Murder Rule: A National Empirical Study*, 101 Denv L Rev 65 (2024), and for its application to deaths caused directly by the police, *see* Maria T. Kolar, *Felony Murder Liability for Homicides by Police: Too Unfair & Too Much to Bear*, 113 J Crim L & Criminology 241 (2023).

We need not address those criticisms in this case. Today's decision is limited to the rule's application to defendant's felony murder convictions.[13] In affirming those convictions, we need not and do not suggest that *every* application of the rule will comply with due process.

## III.   CONCLUSION

We conclude that the trial court did not err in (1) declining to suppress statements that defendant made during the interrogation by detectives Michaels and Luiz; and (2) denying defendant's demurrer to the felony-murder counts.

The decision of the Court of Appeals and the judgment of the circuit court are affirmed.

**DeHOOG, J.,** concurring.

In this case, defendant entered the apartment he had previously shared with his former girlfriend, TM, and, in an apparently alcohol-fueled fit of despair and rage, doused TM's couch with gasoline and threatened to set it on fire if TM did not return. When TM did not return, defendant—who had good reason to know that at least one of TM's two roommates and several of TM's pets might be in the apartment—lit the gasoline-drenched couch and left

---

[13] As Roth and Sundby point out, requiring proof of culpability for causing death "may not change the result in many cases" because, if a defendant "undertakes a dangerous felony, he probably has exhibited the extreme recklessness or malice aforethought necessary for a conviction of murder." 70 Cornell L Rev at 491. Defendant in this case intentionally doused a couch in gasoline and started a fire in his ex-girlfriend's apartment around 3:20 a.m., knowing that she had two roommates who would likely be asleep in the apartment at the time. Those facts would support the conclusion that defendant recklessly caused the death of two people sufficient to support convictions for criminal homicide as defined in ORS 163.005(1).

the apartment, closing the door behind him as an inferno erupted, ultimately consuming the apartment and causing the deaths of two people and four pets. Based upon the testimony of TM and other witnesses, text messages that defendant had sent before and after the fire broke out, video evidence of defendant leaving TM's apartment, and rambling admissions that defendant made during a police interrogation, the state prosecuted defendant for numerous offenses, including three counts of arson, four counts of intentional murder, and the "felony murder" charges at issue on appeal. Following a bench trial, the court found defendant guilty of most of the charged offenses or lesser-included versions of them, including four counts of felony murder and four counts of first-degree manslaughter, with two counts of each offense relating to each of TM's two roommates.[1]

        Based upon that reprehensible conduct and the evidence of it in the record, there can be little doubt as to defendant's guilt of the charges on which the trial court found him guilty. Nor, in my view, is there any question as to whether defendant's custodial statements were voluntarily made, and I fully agree with the majority opinion's analysis and conclusion regarding that issue. Where I part ways with that opinion, however, is in the majority's approach to defendant's challenge to his felony-murder convictions, and particularly its disposition of defendant's argument premised on this court's opinion in *State v. Blair*, 348 Or 72, 228 P3d 564 (2010) (*Blair II*), which held that the felony-murder statute, ORS 163.115(1)(b), does not require the state to allege and prove that a person acted with a culpable mental state with regard to that offense's causation-of-death element.

        As I will explain, I do not believe that the majority's view—that, contrary to defendant's contention, *Blair II* does

---

[1] In rendering its verdicts, the trial court declined to explain the basis for its findings as to each count, noting that, like a jury completing a verdict form, a trial court sitting as factfinder in a trial is under no obligation to explain its decision. However, given the statutory definition of first-degree manslaughter and the evidence presented at defendant's trial, it appears that the court found either that defendant had acted recklessly under circumstances manifesting extreme indifference to the value of human life, or that he had intentionally caused the deaths of TM's roommates while under the influence of extreme emotional disturbance. ORS 163.118(1)(a), (b).

not effectively hold that the felony-murder statute provides for a conclusive presumption—can be reconciled with *Blair II* itself. Further, that erroneous understanding is legally significant because it permits the majority to rely on a body of case law from other jurisdictions that, in my view, does not address the issue that defendant raises under *Blair II*. Ultimately, however, I conclude that the error has no practical significance. That is, although I believe that the trial court may well have erred in denying defendant's demurrer to the felony-murder charges (and that the majority may therefore have erred in rejecting defendant's underlying argument), I would conclude that any error was harmless beyond a reasonable doubt. That is, had the trial court allowed defendant's demurrer or otherwise required the state to prove a culpable mental state with respect to causing the victims' deaths, it is beyond reasonable doubt that the state would have done so and that the trial court would have found defendant guilty of felony murder under those alternative circumstances. Thus, although I do not agree with the majority's rationale, I respectfully concur in its ultimate disposition upholding defendant's felony-murder convictions.

I will begin with defendant's reliance on *Blair II* before turning to how, in my view, the majority opinion misreads that decision and thus sidesteps the crux of defendant's argument. As the majority explains, defendant contends that the trial court erred in denying his demurrer to the felony-murder charges, because ORS 163.115(1)(b)—as construed in *Blair II*—violates the Due Process Clause. 375 Or at 16-17. He argues that, if he understands *Blair II* correctly, then the felony-murder statute establishes an impermissible conclusive presumption. *See Sandstrom v. Montana*, 442 US 510, 99 S Ct 2450, 61 L Ed 2d 39 (1979) (because jurors could reasonably view instruction that the law "presumes that a person intends the ordinary consequences of his voluntary acts" as directing them to find against the defendant on the element of intent, that instruction impermissibly relieved the state of its burden under the Due Process Clause to prove every element of a criminal offense beyond a reasonable doubt).[2]

---

[2] Defendant alternatively argues that, if the felony-murder statute does not result in a conclusive presumption, then it creates an impermissible strict-liability

　　　The majority opinion acknowledges that, "[u]nder *Sandstrom*, a statute that results in a burden-shifting or conclusive presumption as to a material element of the offense violates due process." 375 Or at 17. The majority also recognizes that, under ORS 163.115(1)(b), felony murder is a form of criminal homicide, and that "criminal homicide" is defined by ORS 163.005(1) as "intentionally, knowingly, recklessly or with criminal negligence caus[ing] the death of another human being." *Id.* at 17-18. Finally, the majority agrees with defendant that, notwithstanding ORS 163.005(1), the felony-murder statute, as construed in *Blair II*, "does not require proof of a separate culpable mental state as to causing death[.]" *Id.* at 18. The majority rejects, however, defendant's understanding that, under *Blair II*, felony murder includes—as a required element—a culpable mental state with regard to causing death, albeit one that the state does not have to separately allege and prove. *Id.*

　　　In rejecting defendant's understanding of *Blair II*, the majority reads into that opinion a holding that, not only is the state not required to *prove* a separate culpable mental state as to the causation of death, *see id.* (so stating), but, further, there *is* no culpable mental state requirement in that regard, *see id.* (stating that "there is no separate culpable mental state required for causing death on a felony-murder charge") With that premise read into *Blair II*, the majority's conclusion in this case readily follows: Because the felony-murder statute does not require that a defendant act with a culpable mental state with regard to causing death, "the law does not conclusively presume any element that the state is required to prove." *Id.*[3]

---

crime by failing to require proof of a culpable mental state as to causation of death. Because I agree with defendant's understanding of *Blair II* and, thus, tend to agree that the felony-murder statute creates an unconstitutional conclusive presumption, I express no opinion whether the absence of a mental state as to the causation of death would render felony murder a strict-liability crime or whether such a crime would violate due process.

　　[3] Relatedly, the majority is skeptical of my reasoning, discussed below, that *Blair II* recognized a culpable mental state regarding causation of death "as an element that the state is not required to prove." 375 Or at 20-21 n 3. In the majority's view, if the state is not required to prove such a mental state, then it cannot be understood to be an element. *Id.* Respectfully, the majority misses the point. It is exactly *because* the felony-murder statute, as interpreted in *Blair II*, does not require the state to prove any of the culpable mental states that ORS 163.005(1) contemplates

Respectfully, however, *Blair II* cannot so easily be read to dispense with *any* culpable mental state requirement with respect to causing death. Three aspects of that decision weigh heavily against that reading. The first is found in the text of the opinion itself. As the majority notes, *id*. at 20, *Blair II* loosely wraps up its analysis with the following series of pronouncements:

> "(1) under ORS 163.005(1), 'criminal homicide' requires that a defendant act with a culpable *mens rea* with respect to causing the victim's death; (2) under ORS 163.005(2), 'criminal homicide' includes 'murder,' and (3) under ORS 163.115(1)(b), requisite culpable *mens rea* is established, as a matter of law, by the defendant's commission or attempted commission of the predicate felony."

348 Or at 80.[4]

Although the intended connection between those three enumerated points is not clear, it is certainly difficult to reconcile the first two points—stating that "criminal homicide" requires a culpable mental state with regard to causing a victim's death and that "criminal homicide" includes "murder"—with the conclusion that the majority attributes to the third point—that, for purposes of felony murder, "there is no separate culpable mental state" as to causation of death, 375 Or at 18. That is, it would make little sense for the court in *Blair II* to emphasize that ORS 163.005(1) establishes a mental state requirement for criminal homicide and that criminal homicide includes murder if the court's ultimate point were that, for "felony murder," *no* such culpable mental state is required. If that were, in fact, the court's intended takeaway, it is far more likely that it would have said something closer to, "unlike 'ordinary' murder, a form of 'criminal homicide' to which the mental state requirements set forth in ORS 163.005(1) apply, no

_____

that defendant argues that the statute creates a conclusive presumption. Thus, to reason that such a mental state cannot be an element simply begs the question.

[4] I recognize that the accepted translation of the Latin term "mens rea" is "guilty mind." *See, e.g.*, *Black's Law Dictionary* 1178 (12th ed 2004) ("[Law Latin 'guilty mind'] (18c) The state of mind that the prosecution, to secure a conviction, must prove that a defendant had when committing a crime[.]"). Thus, referring, as we did in *Blair II*, to a "culpable *mens rea*" would appear to be redundant. Except in quoted references to other sources, this concurrence equates *mens rea* with "culpable mental state."

such mental state is required for felony murder." But, significantly, the court did not say that. Instead, after emphasizing the first two points, which together establish that "murder" requires that a defendant act with a culpable mental state with respect to causing death, the court said that, "under ORS 163.115(1)(b), [*i.e.*, felony murder, the] requisite culpable *mens rea* is established, as a matter of law, by the defendant's commission or attempted commission of the predicate felony." In my view, the most sensible way to read that statement is to understand the court's reference to "[the] requisite culpable *mens rea*" as referring to the culpable mental state that ORS 163.005(1) and (2) collectively require for murder, including "felony murder" under ORS 163.115(1)(b). Yet here, the majority seems to reach the opposite conclusion from that text, wholly disconnecting the third point in the series from the two that precede it.[5]

The second aspect of *Blair II* that weighs against the majority's understanding is that, in that opinion, this court expressly agreed with the Court of Appeals decision it was reviewing, *State v. Blair*, 230 Or App 36, 214 P3d 47 (2009) (*Blair I*). *See Blair II*, 348 Or at 80 (expressing agreement). And in *Blair I*, the Court of Appeals did several notable things. First, after recounting the historical application of the felony-murder rule in Oregon, that court concluded that, at least prior to the enactment of ORS 163.115(1) in 1971 as part of the new Oregon Criminal Code, the legislature and this court had long recognized the "implied malice" rule, under which the state could obtain a conviction for felony murder "without the necessity of proving the relationship between the homicide and the defendant's state of mind." *Blair I*, 230 Or App at 46 ("Rather, the defendant's

---

[5] To be clear, the majority does seem to recognize in a footnote that, by juxtaposing the definitional requirements of ORS 163.005 with the court's citation to the substantive "felony murder" statute, ORS 163.115(1)(b), *Blair II* can be read to recognize a requirement of a culpable mental state as to causing death even for felony murder, but just one that is established as a matter of law by proof of the underlying felony (and, presumably, its own mental state requirement). 375 Or at 20 n 1. But the majority goes on to observe that, in *Blair II*, the court did not have reason to explore whether the mechanism that it described for establishing "any [such] culpable mental state requirement" resulted in a conclusive presumption implicating due-process concerns. *Id.* That's true, but it does not explain why closer examination of that possibility is not warranted here, where the issue is squarely presented.

commission of or attempt to commit the predicate felony established as a matter of law the requisite *mens rea* with respect to the causation of the victim's death."). *See also Blair II*, 348 Or at 77-80 (recounting that history).

Next, the Court of Appeals recognized that, in 1971, the legislature had adopted "ORS 163.005, the general 'criminal homicide' statute, which had no direct antecedent in Oregon homicide laws[.]" *Id*. at 48. And although that court found no evidence in the 1971 legislative history to indicate an intent to change the "implied malice" rule, *id*. at 46 ("Rather, the legislative history reveals the opposite."), the court recognized the need to reconcile its understanding of ORS 163.115(1)(b) with ORS 163.005(1)'s provision of a minimum culpable mental state for criminal homicide, *id*. at 47.

And last, the Court of Appeals did reconcile those competing ideas. First, it acknowledged the requirement that the defendant act with a culpable mental state with respect to causing the victim's death, and then it stated—in terms that this court subsequently echoed in *Blair II*—that, under the felony-murder statute, the requisite mental state is established as a matter of law:

> "[T]he two provisions can, and must, *be harmonized* in such a way that (1) under ORS 163.005(1), *all types* of 'criminal homicide' require that a defendant act with a culpable *mens rea* with respect to causing the victim's death; and (2) *for that particular subspecies of criminal homicide that is 'felony murder,'* the requisite culpable *mens rea* pertaining to the death is established, as a matter of law, by the defendant's commission or attempted commission of the predicate felony."

230 Or App at 55-56 (emphases added; footnotes omitted). Thus, rather than stating that, under the felony-murder statute, there is no requirement that a defendant act with a culpable mental state with regard to causing a death, the Court of Appeals expressly recognized that, by virtue of ORS 163.005(1), there *is* such a requirement, just one that is established as a matter of law rather than alleged and proved as part of the state's case.

In agreeing with the Court of Appeals' decision in *Blair I*—using, at times, nearly indistinguishable phrasing and narrative form—this court's decision in *Blair II* cannot be viewed as holding that the felony-murder statute does not require that a defendant act with a culpable mental state with respect to causing death. Rather, just like the Court of Appeals opinion it was affirming, *Blair II* is best understood as recognizing that such a mental state *is* an element of felony murder, albeit one as to which the state bears no separate burden of proof.

Finally, the third aspect of *Blair II* that weighs against reading it as the majority does is the logical predicate essential to its conclusion. Specifically, before the court in *Blair II* could hold that, "under ORS 163.115(1)(b), [the] requisite culpable *mens rea* is established, as a matter of law, by the defendant's commission or attempted commission of the predicate felony[,]" the court necessarily understood there to *be* a "requisite *** mens rea*," that is, a required culpable mental state with regard to causinGg death. *Blair II*, 348 Or at 80; *see also* 375 Or at 20 n 1 (stating that *Blair II*'s reading of ORS 163.005(1) "in conjunction with ORS 163.115 (1)(b) meant that any required culpable mental state for causing death was established as a matter of law by proof of the culpable mental state for the predicate felony") (375 Or at 20 n 1). If the felony-murder statute had no such requirement, then there would be nothing to be established as a matter of law.

Thus, in my view, the majority's approach to defendant's "conclusive presumption" argument flows from a misguided understanding of this court's opinion in *Blair II*. And for several reasons, that matters. The first, of course, is that, under the principle of *stare decisis*, this court must adhere to its precedents until they are overturned, and this court cannot fulfill that obligation by proceeding from a misunderstanding of what its earlier cases have held.

Second, as noted above, the majority's reading of *Blair II* allows it to summarily dismiss defendant's contention that the felony-murder statute results in an impermissible conclusive presumption. *See* 375 Or at 18 ("Because there is no separate culpable mental state required for causing

death on a felony-murder charge, the law does not conclusively presume any element that the state is required to prove."). In concluding that there is no culpable mental state requirement in that regard, the majority opinion sidesteps the more difficult question, namely, *if* the felony-murder statute *does* have a mental state requirement with respect to causation of death, does a rule establishing that requirement "as a matter of law" result in a conclusive presumption of the sort held to violate due process in *Sandstrom*? It is not readily apparent to me why a rule that establishes an element of an offense "as a matter of law" upon proof of a different element of a different offense would not be considered a conclusive presumption, and, as noted above, my initial inclination is to think that it would. But my point here is not that the answer is obvious, and I acknowledge that reasonable minds may differ as to that answer. My concern here is that defendant's arguments have raised that question, but the majority's interpretation of *Blair II* evades it here and further insulates it from future consideration.

Third, and finally, the majority's reading of *Blair II* allows it to rely on case law from other jurisdictions, where neither the statutes at issue nor the applicable decisional law recognized, as an element of felony murder, a culpable mental state with respect to causing the death of another. For example, the majority opinion discusses the Kansas Supreme Court's decision in *State v. Patterson*, 311 Kan 59, 455 P3d 792 (2020), and suggests that the reasoning of that case supports the majority's conclusion that Oregon's statute does not create a conclusive presumption. 375 Or at 21-22. But, as the majority acknowledges, "[t]he Kansas statute does not include a definitional provision for 'murder' or 'homicide' that imports a general term like 'criminal homicide' into its definition of murder comparable to ORS 163.005(1)." *Id*. at 22 n 5.

Similarly, the majority opinion cites *State v. Burkhart*, 325 Mont 27, 42, 103 P3d 1037, 1044, 1047 (2004), a Montana Supreme Court decision that construed that state's felony-murder statute to "substitute proof" of the mental state required to establish the underlying felony for the proof that otherwise would be necessary to establish

"deliberate homicide" under a separate statutory provision. 375 Or at 22-23. But as in Kansas, Montana law did not make a culpable mental state as to causing death an element of felony murder, so that court's decision that its statute did not create an impermissible conclusive presumption is likewise not on point.[6]

The same is true regarding the other opinion discussed at length by the majority, *State v. Wanrow*, 91 Wash 2d 301, 588 P2d 1320 (1978), *superseded by statute*, 1975 Wash Sess Laws 863, *as recognized in In re Personal Restraint of Andress*, 147 Wash 2d 602, 56 P3d 981 (2002), and, as far as I have determined, each of the cases that the majority string-cites in favor of its conclusion that ORS 163.115(1)(b) is constitutional. *See* 375 Or at 23-24( discussing *Wanrow*); *id.* at 24 (listing other cases). As the majority opinion acknowledges, none of the cases it relies on in concluding that Oregon's felony-murder statute is constitutional involved statutes that had, as an element of felony murder, a culpable mental state with respect to causing death. *Id.* (so noting). Thus, because the premise underlying the majority's reliance on those cases—that Oregon's felony-murder statute has no such requirement—is, in my opinion, flawed, the majority's reliance on those cases to support its conclusion that Oregon's statute complies with the requirements of due process is equally flawed.

As a final note regarding the majority opinion, both it and many of the cases it cites acknowledge the potential for the felony-murder rule to lead to disparate and harsh results. *See* 375 Or at 30-31 (acknowledging wide criticism of the rule by scholars and jurists; citing numerous scholarly articles and studies). Although it may not go that far in addressing those concerns, recognizing ORS 163.005(1)'s definition of "criminal homicide" as requiring, for purposes of felony murder, that the state prove that a defendant acted

---

[6] In any event, *Burkhart* has other limitations, as it does not appear to reflect a careful analysis of the *Sandstrom* issue, and instead states somewhat summarily that the Montana statute "does not operate to shift a burden from the state to the defendant[.]" 325 Mont at 42, 103 P3d at 1047. That may be true, but that does not necessarily mean that the statute did not unconstitutionally relieve the state of a burden of proving an element of an offense. *See Sandstrom*, 442 US at 524 (holding that a statute that shifts the state's burden of proof to the defendant *or* that creates a conclusive presumption violates due process).

with a culpable mental state with regard to a victim's death would be a small step in that direction. This court's decision in *Blair II* precludes direct application of ORS 163.005(1) in the form of a jury instruction or otherwise, and, as the majority has observed, the correctness of *Blair II* is not before us. However, the meaning of that case *is* before us, and the majority's reading of it curtails defendant's plausible challenge to Oregon's felony-murder law. Given the significance of that reading, as well as the reasons stated above for why, in my view, that reading is erroneous, I cannot agree with the majority's analysis here.

That is not to say that I dissent. For one thing, although I disagree with the majority's reliance on *Blair II* to foreclose defendant's "conclusive presumption" argument, the question remains whether Oregon's felony-murder statute, as defendant reads *Blair II* to construe it, would indeed violate the Due Process Clause. Although, as I have stated, it is challenging to distinguish an element that is "established as a matter of law" from one that is "conclusively presumed," especially when both concepts are triggered by proof of the same underlying fact, my point is not that I am certain how a proper due-process inquiry would turn out. My point is simply that we should begin that inquiry from the correct premise, which, in my view, the majority opinion does not do.

The other reason that I do not dissent is that, as discussed above, I view any error that the trial court may have made in denying defendant's demurrer to the felony-murder counts to be harmless beyond a reasonable doubt. *See State v. Cook*, 340 Or 530, 544, 135 P3d 260 (2006) ("A federal constitutional error is harmless, such that the conviction will be upheld, if the reviewing court may confidently say, on the whole record, that the constitutional error was harmless beyond a reasonable doubt." (Internal quotation marks omitted.)); *see also* ORS 131.035 (error is grounds for reversal of criminal conviction only if it "has prejudiced the defendant in respect to a substantial right"); *State v. Davis*, 336 Or 19, 28, 77 P3d 1111 (2003) (under Article VII (Amended), section 3, of the Oregon Constitution, court "must affirm a judgment, despite any error committed at trial, if, after considering all the matters submitted, the court is of the opinion

that the judgment was such as should have been rendered in the case" (internal quotation marks omitted)).

Here, the basis for defendant's demurrer was that the felony-murder counts failed to state offenses, because they did not include allegations that he had acted with one of the culpable mental states listed in ORS 163.005(1) with respect to the deaths that he had caused. However, as noted above, defendant also was tried on multiple counts of intentional murder, and the trial court found him guilty of multiple counts of first-degree manslaughter, including separate counts as to each of defendant's two human victims. First-degree manslaughter has a mental state element of at least recklessness under circumstances manifesting extreme indifference to the value of human life. ORS 163.118(1). It is inconceivable that, had the trial court granted the demurrer, thereby requiring the state to refile and include in its allegations of felony murder that defendant had acted with at least criminal negligence[7] with respect to the victims' deaths, the trial court would have failed to find defendant guilty of felony murder as to each victim. *Cf.* 375 Or at 31 n 13 (noting that, if a mental state were required with respect to causing death, the facts here would support a conviction for criminal homicide under a recklessness theory). Thus, in my view, any error in this case would satisfy the harmless beyond a reasonable doubt standard so as not to warrant reversal. Accordingly, I respectfully concur.

---

[7] Under ORS 163.005(1), the minimum culpable mental state for "criminal homicide" is criminal negligence, and defendant has not argued that the state should have been required to allege and prove any more culpable state of mind.